## EXHIBIT A

### Agreement on Corporate Governance and Compliance Revisions

The parties have been engaged in settlement negotiations continually from

January 2003 through the present. The detailed recommendations made by plaintiffs'

counsel on each of the corporate governance and compliance subjects discussed herein,

along with the Derivative Actions[1] and the negotiations concerning their resolution, were

a substantial factor in the design and implementation of the changes adopted by Schering-

Plough ("SGP" or "Company") and set forth herein. The compliance-related changes

provide a substantial benefit to the Company, including in the prevention and detection of

potential violations of law, regulation, or Company policy.

A.    BOARD OF DIRECTORS LEVEL.

1.    Director Qualifications. The Company has enhanced, or has agreed to

enhance, its director qualifications standards as follows:

a.    The Company's Corporate Governance Guidelines ("Guidelines")

were amended to mandate, *inter alia*, that:

(i)    "[n]ominees [for election as directors] have the highest

ethical character and share the values of Schering-Plough as

reflected in the Leader Behaviors";

---

[1] For the purposes of this document only, the term "Derivative Actions" refers collectively to:
(i) the claims raised in the Joint and Consolidated Second Amended Shareholder Derivative
Complaint filed on June 4, 2007 in In re Schering-Plough Corporation Shareholders Derivative
Litigation, No. 01-1412 (KSH) (D.N.J.); and (ii) the shareholder letter to Schering-Plough's
board of directors dated December 26, 2001.

(ii)     "[n]ominees are highly accomplished in their respective field, with superior credentials and recognition"; and

(iii)    "[n]ominees must indicate that they have the time and commitment to provide energetic and diligent service to Schering-Plough."

b.      The Company has instituted the practice of retaining an outside consultant who confirms that each potential nominee meets the criteria set forth in the Guidelines, along with providing other relevant background data, in reports to the Nominating and Corporate Governance Committee.

c.      The Company will amend the Guidelines to add "governance-and-compliance-oversight experience" as one of the areas of expertise listed in Paragraph 4 of Board Composition and Director Qualifications. Plaintiffs recognize that it can be difficult to identify or recruit directors with specific expertise in this area and acknowledge as part of this settlement that a broad range of business and other experience must be considered in assessing nominees.  The Company is committed to finding the most qualified possible board candidates and will endeavor to identify candidates with governance-and-compliance-oversight experience to the extent practicable.

2.     Heightened Director Independence Standard.

        a.     The Company has adopted the following Schering-Plough Board

Independence Standard, which is significantly more restrictive than the

mandatory New York Stock Exchange ("NYSE") Listing Standards

independence provisions:

> Schering-Plough Board Independence Standard.  If a
> Director is to be classified as independent, he or she
> must meet the independence requirements in the New
> York Stock Exchange corporate governance listing
> standards and the following, more restrictive
> categorical standard, called the "Schering-Plough Board
> Independence Standard":
>
> 1.  A Director who is an executive officer or an employee,
>     or whose immediate family member is an executive
>     officer, of a company that makes payments to, or
>     receives payments from, Schering-Plough for property
>     which, in any single fiscal year, exceeds the greater of
>     $500,000 or 2% of such other company's consolidated
>     gross revenues, is not "independent" until three years
>     after falling below such threshold.
>
> 2.  Directors are independent of any particular constituency
>     and are able to represent all shareholders of Schering-
>     Plough.
>
> 3.  In the event that a Director is an executive officer or an
>     employee, or his/her immediate family member is an
>     executive officer, of a charitable organization that
>     receives payments from Schering-Plough which, in any
>     single fiscal year, exceed the greater of $500,000 or 2%
>     of the charitable organization's gross revenues, such
>     payments will be disclosed in the proxy statement.
>
> 4.  A Director who was, or whose immediate family
>     member was:

3

- an executive officer of Schering-Plough, or
- affiliated with or employed by the independent auditor, or
- an executive officer of another company where any of Schering-Plough's current executives serve on that company's compensation committee

will not be independent until four years after the end of such relationship.

In this Standard, "immediate family" shall have the meaning provided in the New York Stock Exchange corporate governance listing standards (general commentary to Section 303A.02(b)).

b.   The Company's new standard differs from the NYSE standards in the following ways:

(i)     Under the Company's standard, an independent director must be "independent of any particular constituency and ... able to represent all shareholders of Schering-Plough." There is no corresponding requirement in the NYSE standards.

(ii)     For directors who were, or whose immediate family member was, an executive officer of Schering-Plough, the Company's standard provides that such a director is not independent until four years after the end of such relationship. The corresponding provision of the NYSE standards is less restrictive, in that (A) for a director

4

who has been an employee of the listed company, that
director can be considered independent after only three
years, and (B) for a director who has an immediate family
member who has been an executive officer of the listed
company, that director can be considered independent after
only three years.

(iii)     Under the Company's standard, for a director who
was, or whose immediate family member was, an executive
officer of another company where any of the Company's
current executives serve on that company's compensation
committee, that director cannot be considered independent
until four years after the end of such relationship.  By
contrast, under the NYSE standards, such a director can be
considered independent after only three years.

(iv)     Under the Company's standard, for a director who
was, or whose immediate family member was, affiliated
with or employed by the Company's independent auditor,
that director cannot be considered independent until four
years after the end of such relationship.  The corresponding
provision of the NYSE standards is less restrictive, in that

(A) for current relationships with the listed company's independent auditor, the restriction applies only if the director is a partner or employee of the independent auditor or if the director's immediate family member is a partner of the independent auditor or is an employee of the independent auditor who participates in its audit, assurance, or tax compliance (but not tax planning) practice, and (B) for past relationships with the listed company's external auditor, only a director who was, or whose immediate family member was, a partner or employee of the independent auditor and worked on the listed company's audit is subject to any restriction, and such a director cannot be considered independent until three years after the end of such relationship.

(v)     Under the Company's standard, a director is not independent if that director is an executive officer or an employee, or has an immediate family member who is an executive officer of, a company that makes payments to, or receives payments from, the Company for property that, in any single fiscal year, exceeds the greater of $500,000 or

6

2% of such other company's gross revenues, until three years after such payments fall below such threshold.  The NYSE provision governing the same relationship is less restrictive because it utilizes a higher numerical (but not percentage) threshold – $1 million in payments for property within any single fiscal year.

c.      This more stringent independence standard applies to the requirements that all members of the Audit, Compensation, and Nominating and Corporate Governance Committees be independent.

d.      The Company has further agreed that at least a majority of the members of the Business Practices Oversight Committee (or a future committee that shall assume that committee's oversight-of-compliance role) shall be independent in accordance with this more stringent standard.

3.      Director Performance Criteria.  The Company has instituted a practice of annual board self-assessments, which include the adequacy of resources and the sufficiency of time availability, utilizing a detailed questionnaire prepared at the direction of the Nominating and Corporate Governance Committee after benchmarking and consideration of independent materials on best practices prepared by the National Associations of Directors; each director is asked to

7

complete the questionnaire, the results of which are then reviewed with the committee, which reports the results to the full board with proposals for improvements.  The same process is followed for the Audit, Business Practices Oversight, Compensation, and Nominating and Corporate Governance Committees annually.

4.      Limit on Outside Directorships.  The Company has amended its Guidelines to require that potential directorial candidates "must indicate that they have the time and commitment to provide energetic and diligent service to Schering-Plough."

5.      Board Composition.  In part to respond to plaintiffs' board composition objectives:

       a.      in 2003, the Company added new director Philip Leder;

       b.      in 2005, the Company added new directors Thomas J. Colligan and C. Robert Kidder; and

       c.      the Company has acted to reduce the overall size of the board from fifteen directors at the commencement of the action to thirteen as of the execution of the Stipulation.

6.      Election of Directors.  Throughout the settlement negotiations, plaintiffs pressed consistently for elimination of the Company's classified or "staggered" board.  In light of the environment (which was influenced in part by the

8

Derivative Actions, including plaintiffs' proposals), as well as shareholder

feedback, the Company's board ultimately recommended that the Company's

shareholders approve, at the Company's 2006 Annual Meeting, amendments to

the Company's Certificate of Incorporation and By-Laws eliminating the

staggered board.  The Company's shareholders followed the board's

recommendation and approved the elimination of the staggered board at the 2006

Annual Meeting.  The change proposed by the board and approved by the

shareholders at the 2006 Annual Meeting permitted directors whose terms did not

expire in 2006 to serve the remainder of the three-year terms to which they were

elected.  Thus, the 2008 annual meeting would have been the first annual meeting

at which all directors were to be elected for one-year terms.  On December 15,

2006, in light of the current environment (which was influenced in part by the

Derivative Actions, including plaintiffs' proposals), as well as shareholder

feedback, the board announced that it was accelerating the elimination of multi-

year terms so that, starting at the 2007 Annual Meeting, all directors would be

elected to one-year terms.

    7.    <u>Director Training and Education</u>.

        a.    Plaintiffs' proposals with respect to director education were a

factor in the Company's adoption of improved, compliance-related

director education practices, including the institution of an annual formal

9

director education module, with outside experts as instructors, which has covered such areas as, *inter alia*, U.S. Food and Drug Administration regulation of the pharmaceutical industry and the Company's process for compliance with pharmacovigilance regulations.

b.    Consistent with plaintiffs' proposals:

(i)    the full board has been regularly briefed on the legal and regulatory issues related to the Boston and Philadelphia regulatory investigations, including presentations by outside counsel; and

(ii)    the Business Practices Oversight Committee has been briefed, in presentations by the Senior Vice President, Global Compliance and Business Practices, about how the new centralized global compliance function would address behaviors leading to the Boston and Philadelphia regulatory investigations.

c.    The Company has agreed that for the five-year period following the Effective Date of the Settlement (the "Five Year Commitment Period"), board members shall receive, to the extent practicable, training in conjunction with regularly scheduled board meetings on pertinent topics relating to the Company's business, the pharmaceutical industry, the applicable regulatory process, and corporate governance trends.

10

      d.    The Company has further agreed that for the Five Year Commitment Period, if practical given other board business and responsibilities, board members shall have at least one annual on-site visit to a Company operating unit, to facilitate board members familiarizing themselves on operations of that unit and interaction with operating personnel as appropriate.

8.    Director Support.  The Company has agreed that each member of the board will have access to all necessary and appropriate internal and external support to assist him or her in performing all of his or her board-related responsibilities.

9.    Executive Sessions.  The Company has agreed that for the Five Year Commitment Period, except where impracticable given the applicable time and circumstances:

      a.    executive sessions of non-management directors will be held at each regularly scheduled board meeting; and

      b.    an executive session will be held if requested by any non-management director.

10.    Leader of Executive Sessions.

    a.    The Company has instituted a practice of designating a non-management board committee chair to serve as the leader of executive sessions of the board of directors.

    b.    The leadership of the executive sessions rotates every six months.

    c.    The Company will continue this practice for the Five Year Commitment Period, unless the board concludes that there is a structure or rotation period better suited to the board's needs that will preserve the practice of frequent executive sessions of non-management directors.

    d.    For the Five Year Commitment Period, the Company will make regular public disclosures of the manner in which executive sessions are being held and led, regardless of any revisions or amendments by the New York Stock Exchange eliminating such disclosure requirement.

11.    Director Compensation and Stock Ownership.

    a    In 2004, the Company changed its compensation of non-management directors to include:

        (i)    the elimination of per meeting fees;

        (ii)    the adoption of retainers for board committee membership; and,

        (iii)    an increase in the amount of committee chair retainers.

12

b.   In 2005, the Company amended the Guidelines to require directors

to own 5,000 shares within three years of joining the board.

c.   All prior director compensation arrangements were terminated in

2006.  One transparent plan was implemented with shareholder

approval.  Under this plan, directors receive an annual retainer, one-third

of which is paid in stock, and there are no meeting or committee fees

except for service as a committee chair or on the Audit Committee.

12.   Board Oversight of Compliance.  The Company has undertaken the

following:

a.   Subsequent to the filing of the derivative claims against the

Company's board and the board's receipt of the Demand Letter, but

prior to commencement of substantive settlement negotiations, the

Company amended the Business Practices Oversight Committee Charter

to include the following:

(i)   a new provision under "Committee Responsibilities":

2.  Good Manufacturing Practices.  Review
periodic reports on Good Manufacturing
Practices and the Company's compliance with
the Consent Decree with the Food and Drug
Administration entered May 17, 2002.

(ii)   a new provision under "Committee Responsibilities":

3.  Non-Financial Risk Management Matters.
Discuss with management the Company's major

13

> non-financial risk exposures and the steps
> management has taken to monitor and control
> such risk exposures, including the Company's
> risk assessment and risk management policies.

(iii)    a new provision under "Committee Responsibilities":

> 4.  <u>Reports</u>.  Report its activities to the Board at
> such times and in such manner as its deems
> appropriate.  At least annually, the Committee
> or its Chair will meet with the Financial and
> Audit Review Committee or its Chair to review
> compliance and risk matters, including material
> reports or inquiries received from governmental
> agencies and material litigation.

(iv)    new language under "Committee Responsibilities": "In carrying out its purpose, the Committee's policies and procedures should remain flexible, so that it may be in a position to best react or respond to changing circumstances or conditions."

(v)    a new provision under "Advisors": "The Company shall provide for appropriate funding, as determined by the Committee, for payment of compensation to [any in-house or outside legal, accounting, or other] advisors."

(vi)    a new provision under "Membership Requirements" that: "Members shall be appointed and may be removed by the Board upon the recommendation of the Nominating and Corporate Governance Committee."

       (vii)    a new provision under "Meetings and Operation": "The Committee shall meet at least three times a year, or more frequently as it may determine advisable in light of its responsibilities as set forth in this Charter."

b.    Thereafter, as a result of the settlement negotiations with respect to the Derivative Actions, the Company also has agreed to the adoption of significant management-level compliance reforms to support the board's strengthened compliance oversight function. *See e.g.*, Section B.2., Centralized Global Compliance; Section B.6., Integrated Global Audit; Section B.5., Enterprise Risk Management. The compliance-related reforms that had been effectuated by that time were reflected in presentations made in 2006 to the United States Attorney's Office in Boston in connection with the resolution of the investigation being conducted by that office and favorably assisted the Company in resolving the investigation.

c.    The Company has further agreed that[2]:

---

[2]  Under this Settlement, the Company retains the right to alter the structure of the board's committees. If the Business Practices Oversight Committee is discontinued during the Five Year Commitment Period, the board, either directly or through another committee, will continue to undertake the Business Practices Oversight Committee's oversight role. Under such circumstances, the board shall retain the flexibility to conduct such oversight in the manner that it sees fit, subject to the provisions of Paragraph B.4.d herein.

(i)     At least annually, the Business Practices Oversight Committee will review the non-financial and operational audit aspects of the integrated global audit plan prior to its implementation;

(ii)    At least annually, the Business Practices Oversight Committee will be briefed on significant findings of the non-financial and operational audit aspects of the global audit;

(iii)   Egregious findings identified during the course of the global audit will be raised immediately with the chair of the Business Practices Oversight Committee or other appropriate committee;

(iv)    The Business Practices Oversight Committee will receive reports, as appropriate, of significant internal investigations relevant to their compliance-oversight role. *See* Section B.4. below.

(v)     The Company will continue the practices set forth in 12(c)(i)-(iv) for the Five Year Commitment Period, although, under the Settlement, the Company is to retain the flexibility to modify these practices based on a belief that another approach would be more efficient, would increase the quality of the

16

information being obtained in the audits, or would otherwise benefit the Company, but in no circumstance will the Company cease conducting audits of non-financial matters and reporting the results of those audits to the board or appropriate board committee.

(vi)   The Senior Vice President, Global Compliance and Business Practices has direct access to the Business Practices Oversight Committee and its members.  The Senior Vice President, Global Compliance and Business Practices is regularly invited to attend meetings of the Business Practices Oversight Committee and the Vice President-Global Internal Audit is regularly invited to attend meetings of the Audit Committee.

(vii)   The review of the allocation of resources, including for the retention of outside advisors or experts as appropriate, is included within the matters the Business Practices Oversight Committee considers pursuant to Paragraph 1(e) of Committee Responsibilities in the Business Practices Oversight Committee Charter.

(viii)   In overseeing Non-Financial Risk Management Matters pursuant to Paragraph 3 of Committee Responsibilities in the Business Practices Oversight Committee Charter, the Business

17

Practices Oversight Committee regularly receives reports regarding

employee compliance with the Company's Standards of Global

Business Compliance, including with respect to applicable laws

regarding sales and marketing practices.

(ix)     The adequacy of the information flow from management to

the Business Practices Oversight Committee is included within the

matters the Business Practices Oversight Committee considers

when reviewing its performance annually pursuant to Paragraph 5

of Committee Responsibilities in the Business Practices Oversight

Committee Charter.

(x)     Officers of the Company from a variety of relevant

disciplines, such as compliance, audit, or legal, regularly attend

meetings of the Business Practices Oversight Committee;

13.     Super-Majority Voting Requirements.  In December 2006, in light of the

current environment (which was influenced in part by the Derivative Actions,

including plaintiffs' proposals), as well as shareholder feedback, the board

announced that it would recommend to shareholders that the Company's

Certificate of Incorporation and By-Laws be amended to reduce all super-majority

requirements to a majority vote.  At the 2007 Annual Meeting, the Company's

18

shareholders followed the board's recommendation and approved the amendment to reduce all super-majority requirements to a majority vote.

14.     Shareholder Rights Plan.  In December 2006, in light of the current environment (which was influenced in part by the Derivative Actions, including plaintiffs' proposals), as well as shareholder feedback, the board announced that it would allow the Company's shareholder rights plan, also known as a "poison pill," to expire in 2007 and that any future shareholder rights plan would be submitted to shareholders for approval within one year of its adoption.

B.     MANAGEMENT LEVEL.

    1.     Executive and Employee Compensation.

        a.     The Company has expressly incorporated the Company's Leader Behaviors, including "business integrity," into its evaluation and compensation scheme, which relates to performance rating, and potential for advancement and directly affects annual compensation.

        b.     Strength in the Leader Behaviors is included in the performance management process for all employees.

        c.     Strength in the Leader Behaviors counts for at least 20% for all employees.

        d.     Strength in the Leader Behaviors counts for at least 30% for executives.

19

e.     The weighting for strength in Leader Behaviors may be higher if particular duties or circumstances warrant.

f.     The Company has agreed to continue the practice of including strength in the Leader Behaviors in the performance management process for all employees for the Five Year Commitment Period and not to decrease the percentage weighting set forth in Section B.1.(c) and (d) above during that time.

2.     Centralized Global Compliance Program.  The Company has taken, or has agreed to take, the following steps:

a.     The Company created the position of Senior Vice President, Global Compliance and Business Practices and retained Brent Saunders, formerly the Chief Risk Officer at a major health care company, to fill that position.[3]

b.     The Senior Vice President, Global Compliance and Business Practices reports to the Company's CEO, meets regularly with the board of directors, and is a member of the Executive Management Team ("EMT"), which is the Company's most senior management committee.

_____

[3]  Effective February 2007, Saunders was named Senior Vice President and President, Consumer Health Care; Lori Queisser took over as Schering's Senior Vice President, Global Compliance and Business Practices.

20

c.      The Senior Vice President, Global Compliance and Business

Practices has direct access to the Business Practices Oversight

Committee, the Audit Committee, and the board.

d.      The Senior Vice President, Global Compliance and Business

Practices has appointed three executive-level compliance officers in the

following three key compliance risk areas:  research and

development/clinical activities, global supply chain (including cGMP

and quality issues), and commercial compliance (including sales,

Medicaid administration and promotional activities).  These three vice

presidents report to the Senior Vice President, Global Compliance and

Business Practices.  They, as well as the Vice President-Global Internal

Audit, work, with assistance from outside experts, as appropriate, to

monitor risk through the use of enterprise risk management ("ERM")

techniques (*see* Section B.5. below), and are responsible for compliance

program design and implementation within their assigned risk areas.

e.      The board has elected a Vice President-Global Internal Audit with

responsibility for internal audit functions.  *See* Section B.6. below.  The

senior audit officer at the Company (presently the Vice President –

Global Internal Audit) will continue to remain a board elected position

for the Five Year Commitment Period.  The Vice President-Global

21

Internal Audit reports directly to the Senior Vice President, Global Compliance and Business Practices and regularly attends Audit Committee meetings and meets in a private session with that committee regularly.

f.     The Senior Vice President, Global Compliance and Business Practices has responsibility over the Company's use of enterprise risk management techniques. *See* Section B.5. below.

g.     The Company has eliminated its former Compliance Review Council and has assigned its responsibilities to the EMT, thus elevating and streamlining management-level committee coordination of compliance activities. *See* Section B.3. below.

h.     The Senior Vice President, Global Compliance and Business Practices has supervised the creation of a new, values-based code of conduct, the Standards of Global Business Practices, that was reviewed with the Business Practices Oversight and Audit Committees.

i.     Under the supervision of the Senior Vice President, Global Compliance and Business Practices and the three VP's appointed as described above, the Company has redesigned its compliance program to:

22

(i)     foster the independence of compliance personnel from business line personnel at the operations level by maintaining direct lines of reporting and accountability for compliance personnel through the centralized global compliance program hierarchy;

(ii)    ensure that operations-level compliance officers are sufficiently knowledgeable about business units to obtain and maintain a full understanding of the business line activities and compliance risks of the business units to which they are assigned; and

(iii)   foster a culture of ethics-based compliance within the Company through training, education, and other communications and actions.

3.    Executive Management Team.  The Company has made the following changes.  The Company has elevated and streamlined its compliance and risk management-related management-level committee structure by eliminating the former Compliance Review Committee and assigning its responsibilities to the Executive Management Team ("EMT").  The EMT consists of the Company's most senior executives, including, at present, the Company's CEO, Executive Vice President and CFO, Senior Vice President, Global

23

Human Resources, Executive Vice President and President, Global

Pharmaceuticals, Executive Vice President and President, Schering-Plough

Research Institute, Senior Vice President and President, Animal Health,

Senior Vice President, Global Compliance and Business Practices, Executive

Vice President and General Counsel, and Senior Vice President and President,

Consumer Health Care. The EMT is responsible for, among other things, the

oversight of compliance and risk management at the senior management level.

The EMT is regularly advised concerning compliance and risk management

issues, including significant internal and external audit and investigative

findings.

4.     Conduct of Investigations.  The Company has made, or has agreed to

make, the following changes:

    a.     The creation of an investigative function directed by the

Company's Vice President-Corporate Compliance (who reports to the

Company's Senior Vice President, Global Compliance and Business

Practices) with responsibilities over, *inter alia*, compliance-related

internal investigations.

    b.     This investigative function will be fully supported with adequate

funding and resources.

c.    When appropriate, the findings of this investigative function are reported to the Business Practices Oversight Committee or other board committee by the Senior Vice President, Global Compliance and Business Practices, the Vice President-Corporate Compliance, or other appropriate officer.

d.    The Company has agreed that, for the Five Year Commitment Period, even if the Company's current compliance personnel, departmental structures, or board committee structure were to change, the Company will continue to have a centralized global compliance function, residing outside the operating business units, fully supported with adequate investigative funding and resources, and a reporting line to the CEO and either the full board or the appropriate board committee.

5.    <u>Enterprise Risk Management</u>.  The Company has undertaken the following steps with respect to enterprise-wide risk management:

a.    The Company's Senior Vice President, Global Compliance and Business Practices piloted enterprise-wide risk management in the areas of legal and regulatory risk, including a program of "mapping" and "scoring" compliance risk by business line.

b.      The Company piloted a program under which an assessment of enterprise-wide risk management was made by management and reported to the board or board committees periodically.

c.      In February 2005, and again in February 2006, the Senior Vice President, Global Compliance and Business Practices made an enterprise risk management presentation to a joint meeting of the Audit and Business Practices Oversight Committees.  In the 2006 meeting, he also reviewed an enterprise-wide risk management system, and the presentation included risk prioritization on a global basis that had been developed during work with Ernst & Young, which had been retained for assistance with enterprise-wide risk management processes.

d.      Certain of the features of enterprise-risk management, such as mapping and scoring, have been integrated into the Company's internal audit processes.

6.      <u>Integrated Global Audit Function</u>.

a.      The Company has made or has agreed to make the following changes to its compliance audit program:

(i)      Revised the Company's audit program so that there is an executive with responsibility for internal audit activities, presently the Vice President, Global Internal Audit, who reports to the

Senior Vice President, Global Compliance and Business Practices, and regularly meets with the Audit Committee in private session.

(ii)     The Vice President, Global Internal Audit has responsibility for the design and implementation of the Company's integrated global internal audit plan.

(iii)     The Company further agrees that, for the Five Year Commitment Period (subject to footnote 2), in connection with the annual integrated global audit plan, the Vice President, Global Internal Audit or other appropriate officer will:

> (1)     review the non-financial and operational aspects of the audit plan with the Business Practices Oversight Committee and obtain approval of the plan from the Audit Committee;
>
> (2)     brief the Business Practices Oversight Committee and Audit Committee annually on significant findings of the integrated global audit; and
>
> (3)     immediately brief the appropriate committee chair on egregious findings of the non-financial and operational audit aspects of the global audit.

b.     The Company further agrees that, for the Five Year Commitment Period:

27

(i)      The integrated global audit will include, as appropriate, financial, operational, and compliance matters.

(ii)     Officers from the compliance and audit areas will conduct periodic assessments of the effectiveness of the Company's internal compliance controls and the Company's Standards of Global Business Practices, and will report on such to the board or a board committee.  These assessments will include:

> (1)    annual assessments of the scope, nature and timing of the information flow necessary and appropriate to support the board's oversight responsibilities;

> (2)    annual review and approval of the audit plan, including audit of operational compliance, for each upcoming year with the board or appropriate board committee;

> (3)    periodic review of the frequency and subject matters of the reports to the board or relevant board committee made by senior governance, audit, and legal officers; and

> (4)    a review with the board or relevant board committee of the allocations of resources to the compliance and audit functions, including outside advisors or experts as appropriate.

28