UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE SCHERING-PLOUGH | : | MASTER DERIVATIVE DOCKET |
| CORPORATION SHAREHOLDER | : | NO. 01-1412 (KSH) |
| DERIVATIVE LITIGATION | : | |
| | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| ALL ACTIONS | : | |
| | : | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
FOR FINAL APPROVAL OF PROPOSED SETTLEMENT AND
AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................ 1

II.    PROCEDURAL AND FACTUAL BACKGROUND ............................ 2

    A.    Commencement of the Derivative Claims ................................ 2

    B.    The Investigatory Process and the Course of
         Settlement Negotiations ............................................... 4

         1.    Plaintiffs' Investigatory and Discovery Process .................... 4

         2.    The Course of the Parties' Negotiation Process ..................... 5

    C.    The Parties' Formal Mediation Process ................................. 7

III.   SUMMARY OF PROPOSED RELIEF ...................................... 10

    A.    Management Level Governance and Compliance Reforms ................. 12

         1.    Centralized Independent Global Compliance ...................... 12

         2.    Restructured Senior Management Compliance Oversight ............ 12

         3.    Robust Operational Audit Function .............................. 13

         4.    Conduct of Investigations ..................................... 13

         5.    Piloting of Enterprise Risk Management Techniques ............... 14

    B.    Board Level Governance and Compliance Reforms ...................... 14

    C.    Other Provisions of the Proposed Settlement ........................... 15

IV.   PLAINTIFFS' EXPERTS FULLY SUPPORT THE PROPOSED
    SETTLEMENT AS REFLECTING "BEST-IN-CLASS" GOVERNANCE
    AND COMPLIANCE PRACTICES AT SCHERING ......................... 16

V.    THE APPLICABLE LEGAL STANDARDS ................................ 20

    A.    Settlements Are Generally Favored .................................... 20

i

B.    Factors Courts in this Circuit Routinely Consider
In Assessing Whether to Grant Final Approval . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C.    Assessment of the Proposed Settlement under the
Relevant Factors for Consideration in a Derivative
Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    1.    The Extent of the Benefit Derived by Schering
From the Proposed Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    2.    The Risks of Establishing Liability, Damages, and
Maintaining the Action through Trial, and the
Concomitant Complexity, Expense, and Likely
Duration of the Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    3.    The Stage of the Proccedings, the Amount of Discovery
Completed and the Opinion of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    4.    The Reaction of Schering Shareholders to
the Settlement Supports Approval . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

VI.    THE NOTICE TO SCHERING SHAREHOLDERS
IS ADEQUATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

A.    Notice was Disseminated in Accordance with the
Preliminary Approval Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

B.    The Notice Procedures Fully Satisfied Due Process . . . . . . . . . . . . . . . . . . . . . . . 33

VII.    THE APPLICATION FOR FEES AND REIMBURSEMENT OF EXPENSES
BY PLAINTIFFS' COUNSEL IS FAIR AND REASONABLE BASED ON
ALL RELEVANT FACTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

A.    Applicable Legal Standards for Consideration of a Fee Request . . . . . . . . . . . . 36

B.    The Substantial Benefit Doctrine in the Third Circuit . . . . . . . . . . . . . . . . . . . . . 37

C.    Consideration of Relevant Third Circuit Factors Fully Supports
Payment of the Agreed Upon Fee Award Here . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    1.    Consideration of the Skill and Efficiency of Counsel
and Any Innovative Terms of the Settlement . . . . . . . . . . . . . . . . . . . . . . 39

2.  The Complexity and Duration of Litigation and the
    Amount of Time Devoted ................................... 41

3.  Plaintiffs Faced Substantial Risks in Prosecuting the
    Derivative Claims ........................................ 41

4.  The Contingent Nature of the Fee ............................. 42

5.  The Standing and Ability of Plaintiffs' Counsel ................... 43

6.  The Fact the Parties, in Arm's Length and Contentious
    Negotiations Pursuant to Formal Mediation, Arrived at
    the Agreed Upon Fee and Expense Amounts ..................... 44

D.  Assessing Attorneys' Fees under the Lodestar Methodology ............... 45

E.  The Request for Payment of Litigation Costs and Reimbursement of
    Expenses is Reasonable ........................................ 47

F.  Assessing Objections to Award of the Fee Request ...................... 47

VIII.  CONCLUSION ...................................................... 49

iii

## TABLE OF AUTHORITIES

### CASES

*Access 4 All, Inc. v. AAMJ, LLC,* 2007 WL 655491 (D.N.J. 2007, Feb. 27, 2007) . . . . . . . . . . . 45

*AT&T Corp. Secs. Litig.,* 455 F.3d 160, 165-6 (3d Cir. 2006) . . . . . . . . . . . . . . . . . 39, 44, 45, 46

*Automotive Refinishing Paint,* 2003 WL 23316645 (E.D. Pa. Sept. 5, 2003) . . . . . . . . . . . 21, 27

*Bell Atlantic Corp. v. Bolger,* 2 F.3d 1304 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 21, 28, 34, 38

*Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining and Manufacturing
Company),* 2007 WL 1468847 (E.D.Pa.,2007, May 14, 2007) . . . . . . . . . . . . . . . . . . . . 45

*Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799 (3d Cir.) *cert. denied,*
419 U.S. 900 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Bullock v. Administrator of the Estate of Kircher,* 84 F.R.D. 1 (D.N.J. 1979) . . . . . . . . . . . . . . 20

*Caremark International Inc. Derivative Litigation,* 698 A. 2d 959 (Del. Ch. 1996) . . . . . . . . . 42

*Cohn v. Nelson*, 375 F. Supp. 2d 844 (E.D. Mo. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In Re Abbott Laboratories Derivative Shareholder Litigation*, Case No. 99 C 7246,
(N.D. Ill. Mar. 1, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*In Re Am. Family Enters.*, 2456 B.R. 377 (D.N.J. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In Re AOL Time Warner Shareholder Derivative Litigation*, 2006 WL 2572114
(S.D.N.Y. Sept. 6, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 48

*In Re Aremissoft Corporation Securities Litigation,* 210 F.R.D. 109 (D.N.J. 2002) . . . . . . . . . 48

*In Re Bristol-Myers Squibb Derivative Litigation*, Master File No. 02-CV-8571
(LAP) (S.D.N.Y., April 26, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In Re Brown Co. Securities Litigation*, 355 F. Supp. 574 (S.D.N.Y. 1973) . . . . . . . . . . . . . . . 43

*In Re Cendant Corp. Derivative Action Litig.,* 232 F. Supp 2d 327

iv

(D.N.J. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 39, 42, 46

*In Re Cendant Corporation PRIDES Litigation*, 243 F.3d 722 (3d Cir. 2001) . . . . . . . . . . . . . 46

*In Re Chambers Dev. Sec. Litig.,* 912 F. Supp 852 (W.D. Pa. 1995) . . . . . . . . . . . . . . . . . . . . 47

*In Re Fine Paper Antitrust Litig*, 751 F.2d 562 (3d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 42

*In Re GMC Pick-up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768
(3d Cir. 1995) *cert. denied,* 516 U.S. 824 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In Re Ikon Office Solutions Inc, Securities Litigation*, 209 F.R.D. 94 (D.N.J. 2002) . . . . . . . . . 48

*In Re Prudential Insurance Company America Sales Practice Litigation*
*Agent Actions,* 148 F.3d 283 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*In Re Prudential Sec. Inc. Limited Partnership Litig.*, 1995 WL 798907
(S.D.N.Y. Nov 20, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*In Re Remeron Direct Purchaser Antitrust Litig.*, 2005 U.S. Dist. LEXIS 27013
(D.N.J. Nov. 9, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*In Re Rio Hair Naturalizer*, 1996 WL 780512 (E.D. Mich. Dec. 20, 1996) . . . . . . . . . . . . . . . 48

*In Re Rite Aid Corp. Securities Litigation*, 396 F.3d 294 (3d Cir. 2005). . . . . . . . . . . . . . . . . . 41

*In Re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . 20

*Maher v. Zapata Corp.*, 714 F.2d 436 (5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 24, 34, 42

*Merola v. Atlantic Richfield Co.*, 515 F.2d 165 (3d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*Mills v. Electric Auto Lite Co.,* 396 U.S. 375 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 37

*Mullane v. Central Hanover Bank and Trust Co.,* 339 U.S. 306 (1950) . . . . . . . . . . . . . . . . . . . 33

*Newman* v. *Stein,* 464 F. 2d 689 (2d. Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Oh v. AT&T Corp.*, 225 F.R.D. 142 (D.N.J. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Shlensky v. Dorsey,* 574 F.2d 131 (3d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 38, 44

*Smith v. DaimlerChrysler Services North America, LLC.*, 2005 U.S. Dist. LEXIS 25116
(D.N.J. Oct. 24, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

v

*Stassi v. Boone*, 2003 WL 21436995 (Tex. Dist. June 6, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Stoetzner v. United States Steel Corp.*, 897 F.2d 115 (3d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . 28

*Texas v. Organon USA Inc. (In re Remeron End-Payor Antitrust Litigation)*,
2005 WL 2230314 (D.N.J. Sept. 13, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 48

*Unite Nat'l Ret. Fund v. Watts*, 2005 U.S. Dist. LEXIS 26246
(D.N.J. Oct. 28, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24, 38

*Walsh* v. *Great Atlantic & Pacific Tea Co.*, 96 F.R.D. 632 (D. N.J.),
*aff'd*, 726 F.2d 956 (3rd Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Worldcom, Inc., Sec. Litig.*, 2004 U.S. Dist. LEXIS 22992 (S.D.N.Y. Nov. 12, 2004) . . . . . . . 43

*Zucker v. Westinghouse Elec. Corp.*, 265 F.3d 171 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 36

## **RULES**

Fed. R. Civ. P. 23.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Plaintiffs, by and through their undersigned counsel, respectfully move the Court for entry of an Order and Final Judgment approving the proposed settlement (the "Settlement") of the Derivative Actions (as defined herein), as set forth in the Stipulation of Settlement dated as of October 3, 2007 (the "Stipulation") and for the approval of the requested award of attorneys' fees and reimbursement of expenses.

## I.    INTRODUCTION

The Stipulation provides for fully funded, wide-ranging corporate governance and compliance reforms adopted and/or agreed to be adopted at Schering-Plough Corporation ("Schering" or the "Company"), with key provisions to be maintained in place for at least five years from the Effective Date of the Settlement (the "Five Year Commitment Period"). As detailed herein and in other submissions to the Court[1], the proposed Settlement reflects the result of extensive, arm's length negotiations over more than four years, both as between experienced counsel and with the benefit of formal mediation.

The proposed Settlement before the Court provides substantial benefits to the Company, helping to place Schering at the forefront of corporate governance and compliance practices in the country, and significantly enhancing the Company's ability to avoid compliance-related exposure going forward.

---

[1]  Plaintiffs' Counsel respectfully direct the Court's attention to the Course of Negotiation of Governance and Compliance Relief (the "Course of Negotiation memorandum"), the Declaration of Mediator Edward A. Infante in Support of the Proposed Settlement and Award of Attorneys' Fees (the "Infante Decl."), the Declaration of Plaintiffs' Expert Professor Donald C. Langevoort Regarding the Substantive Benefits of the Settlement Terms (the "Langevoort Decl."), the Declaration of Plaintiffs' Expert Mr. James Lam (the "Lam Decl."), the Stipulation and Exhibit A to the Stipulation "Agreement on Corporate Governance and Compliance Revisions" ("Exhibit A"), all filed with the Court in support of the proposed Settlement. The Course of Negotiation memorandum is separately filed herewith by Declaration of Karen L. Morris.

1

In accordance with the directives of the Preliminary Approval Order, entered by the Court on November 7, 2007, over 320,000 individual notices were mailed to Schering shareholders and the summary notice was published in *The Wall Street Journal* and *Investors Business Daily*. Notwithstanding the scale of this notice program, only seventeen Schering shareholders filed objections to the proposed Settlement, and none of these objections warrant the denial of the Settlement's approval.

For the reasons set forth herein, Plaintiffs respectfully request that the Court grant final approval of the proposed Settlement as fair, reasonable and adequate to Schering and its shareholders.

## II.    PROCEDURAL AND FACTUAL BACKGROUND

### A.    Commencement of the Derivative Claims

In February 2001, Schering publicly disclosed that it faced manufacturing issues at certain of its facilities and that its principal regulator, the Food and Drug Administration ("FDA"), had decided to delay approval for the Company to market and sell its "next generation" allergy medication, Clarinex. Between March and May, 2001, shareholders of the Company filed derivative actions in both federal and state court in New Jersey. The federal court actions were ultimately consolidated before this Court (the "Federal Derivative Litigation"). As part of this consolidation process, the state court action was stayed and then dismissed without prejudice. Plaintiffs in the Federal Derivative Litigation filed a Consolidated Amended Derivative Complaint (the "Amended Complaint") on November 9, 2001.

The Amended Complaint alleged that certain former officers and certain former and current directors of Schering (the "Individual Defendants") breached their fiduciary duties to Schering and

2

its shareholders with respect to, *inter alia*, their oversight of Schering, including with respect to manufacturing and quality control practices, as well as medical marketing and sales practices, certain of which had become issues in two then on-going (and since resolved) investigations by the United States Attorneys' Offices in Boston and Philadelphia. Plaintiffs contended that alleged wrongdoing in these areas occurred over a period of years, and resulted in financial, operational and reputational damage to the Company.

Separately, following Schering's disclosure on December 21, 2001, of the Company's negotiations with the FDA for a consent decree regarding manufacturing compliance issues, which included payment of $500 million in settlement, Dr. David Sherr, a shareholder of Schering sent a letter on December 26, 2001 to Schering's board of directors (the "Board") demanding, *inter alia*, that the Board institute legal action against certain senior officers and Board members with respect to matters relating to the manufacturing compliance issues discussed above (the "Demand Letter"). The Federal Derivative Litigation and the Demand Letter are collectively referred to herein as the "Derivative Actions."

In January 2002, the Board authorized the creation of an Evaluation Committee of the Board to evaluate whether the derivative claims should proceed. In November 2002, counsel for the Evaluation Committee sent letters to counsel in the Federal Derivative Litigation and Dr. Sherr's counsel setting forth the Evaluation Committee's recommendation, and the Board's decision to reject the Demand Letter and move to dismiss plaintiffs' derivative claims. In late 2002, prior to filing any motion to terminate, defendants, through their counsel, approached Plaintiffs' Counsel[2] regarding

---

[2]  Plaintiffs' Counsel as used herein includes both demand futility counsel (the law firms of Morris and Morris LLC Counselors At Law, Law Offices of Bernard M. Gross, P.C., and Squitieri and Fearon, LLP) in
(continued...)

3

potential settlement of the derivative claims.  Recognizing the risks of continued litigation for both

parties, plaintiffs and defendants began to explore a possible resolution of the derivative claims.

## B.    The Investigatory Process and the Course of
##        Settlement Negotiations

### 1.    Plaintiffs' Investigatory and Discovery Process

Following the completion of the Evaluation Committee's work, plaintiffs were given access

to the Evaluation Committee's report and the extensive documentation underlying the committee's

investigation.  Additionally, commencing in 2002 and continuing throughout 2003 and 2004, the

parties engaged in discussions, including coordination with the securities plaintiffs,[3] with respect to

document discovery.  Pursuant to this process, plaintiffs were given access to hundreds of thousands

of pages of documents that were being produced in the separately pending securities class action.

Plaintiffs analyzed these documents in detail, focusing both on the development of the underlying

liability claim and on analysis of the governance and compliance systems and processes at the

Company and how they functioned during the period of the alleged wrongdoing.  Plaintiffs were also

given access to multiple deposition transcripts in the securities action from which plaintiffs

developed a further understanding of the compliance systems originally in place at Schering.

Separately -- as part of the settlement negotiations described below -- Plaintiffs' Counsel

were given direct access to Company personnel as well as to outside advisors or consultants to the

Company.  Meetings with these individuals further informed plaintiffs' understanding of the alleged

---

[2] (...continued)

the Federal Derivative Litigation and counsel for Dr. Sherr (the law firm of Abraham, Fruchter & Twersky
LLP).

[3]    A separate class action alleging securities fraud was brought against Schering and certain officers under
the Securities Exchange Act, Rule 10(b)-5.

4

wrongdoing and how management and compliance systems within the Company functioned. Plaintiffs also interviewed Company personnel and outside advisors with respect to the alleged medical marketing, sales, and rebate issues, which further assisted Plaintiffs' Counsel in assessing the underlying claims, and, as described below, in designing governance and compliance proposals.

In addition to plaintiffs' factual investigation, Plaintiffs' Counsel undertook legal research and factual investigation relevant to, *inter alia*, (i) demand futility and demand made allegations in a derivative context; (ii) the merits of plaintiffs' underlying breach of fiduciary duty claims; (iii) analysis of the Evaluation Committee's report, recommendations and process; (iv) the identification and quantification of potential derivative damages suffered by Schering; and (v) available corporate governance and compliance source materials, including developing governmental guidelines, private reform proposals and academic and industry literature in assessing the compliance regimes within Schering and in helping to fashion appropriate prospective governance and compliance relief.[4]

### 2. The Course of the Parties' Negotiation Process

Cognizant of the risks each side faced in continued litigation, the parties met in January 2003 to explore a possible resolution of the derivative claims. Plaintiffs made clear from the outset of these discussions that any resolution of the claims would have to involve substantial governance and

---

[4]  See, e.g., Declaration of Karen L. Morris in Support of Final Approval of Settlement, filed separately herewith, ¶¶ 18-22. In connection with the mediation, discussed below, Plaintiffs prepared a detailed description of their investigatory process, and the research process underlying the design and drafting of their governance and compliance proposals provided to the Company as a basis for negotiations. This document, titled "Overview of the Parties' Governance and Compliance Reform Process" (the "Overview"), also provides a general description of the negotiation process between the parties, and was approved by Defendants' Counsel to the extent it described Defendants' actions. Plaintiffs' Counsel would be pleased to provide a copy of the Overview to the Court should it so desire.

compliance reforms at the Company.[5]   From the initial session, plaintiffs urged significant restructuring of the Company's compliance regime.[6]

The parties' discussions continued throughout 2003, with detailed discussions of multiple compliance and governance issues, leading up to plaintiffs' presentation to the Company and its counsel in October 2003 of a comprehensive Corporate Governance Plan (the "CGP"). Plaintiffs' proposals in the CGP were looked to as a template for the type of effective Board and management-level oversight designed to avoid future problems with regulators and others. In January 2004, plaintiffs provided to the Company a detailed White Paper addressing the proposed application of enterprise risk management principles at Schering, for which plaintiffs had been actively advocating.

The parties' discussions continued. As plaintiffs urged, and particularly following the Company's retention of a new Chief Executive Officer in April 2003, the Company began actively to implement many of the concepts and reforms proposed by plaintiffs. For example, in October 2003, the Company announced the retention of a Senior Vice President of Global Compliance and Business Practices charged with the creation of an independent compliance function at Schering. The newly hired head of Global Compliance, among other Schering personnel, participated in the parties' discussions, permitting a direct flow of ideas between Plaintiffs' Counsel and those at the Company responsible for the continued process of governance and compliance reform. Plaintiffs'

---

[5]  The negotiations also included discussion regarding a potential global settlement involving the securities claims and the Company's insurance carriers. *See* Section II.C. below.

[6]  For example, beginning in January 2003, plaintiffs proposed that the Company's reorganization of its compliance system – creating an independent global compliance structure, independent of the business lines, headed by a Chief of Global Compliance, reporting directly to the Board.

6

Counsel met with outside advisors to the Company with respect to the adoption and implementation of risk management techniques.

The Company's newly-appointed Corporate Secretary also participated in the parties' negotiations, particularly regarding the negotiation and development of reforms at the Board level . During these negotiations, the parties discussed multiple proposals set forth in the CGP and the concerns underlying them. As with the management level reforms, the Company implemented Board level changes on an as-ready, ongoing basis, for example, adopting new Board independence standards in February 2004.

Altogether, over the course of the four-year negotiation process, the parties met face-to-face at least thirty times and engaged in dozens of phone conferences focused on the detailed nature of the proposed governance and compliance relief.

### C.    The Parties' Formal Mediation Process

In November 2005, the parties to the derivative claims, together with the class action securities plaintiffs and counsel for Schering's insurance carriers, undertook to mediate a global resolution of the securities and derivative actions. Retired Magistrate Judge Edward A. Infante, the former Chief Magistrate Judge of the U.S. District Court, Northern District of California, was selected by the parties and the carriers to mediate this process. Despite intensive efforts, including extensive written submissions and lengthy face-to-face and telephonic negotiation sessions extending into 2006, these efforts faltered.

In March 2006, the parties to the derivative claims approached Judge Infante regarding a separate effort to resolve the derivative claims (i) without resolving the class action claims; and (ii) based on the extensive progress the parties had already made on governance and compliance reforms.

7

The parties made detailed submissions to Judge Infante in advance of negotiation sessions he conducted in New York in December 2006 and January 2007 aimed at finalizing the substantive terms of a settlement of the derivative claims.

In coordination with the defendants, plaintiffs prepared the Course of Negotiation memorandum detailing the negotiation history with respect to each of the governance and compliance provisions set forth in Exhibit A to the Stipulation. This document describes the negotiation of the provisions, including discussion of plaintiffs' original proposals, the principles underlying each of these proposals, the Company's responses, and a description of the agreed-upon reforms. Plaintiffs intended this document to describe the process by which the parties arrived at the reforms the Company has implemented, will implement, or will continue to implement as part of the Settlement. Plaintiffs also prepared the Overview described above in footnote 4.

Significantly, plaintiffs also retained experts in the fields of corporate governance and compliance and risk management to evaluate the proposed Settlement and the nature of the benefits it provides to Schering. *See* Section IV below.

In advance of the January 5, 2007 mediation session, the mediator was provided with the Overview, and drafts of the Stipulation, Exhibit A to the Stipulation, the Course of Negotiations memorandum, and the expert declarations. *See* Infante Decl. ¶¶ 21-26.

At the January 5, 2007 mediation session, the parties presented the mediator with detailed briefings regarding, *inter alia*, the settlement process, terms agreed upon to date, and the benefits to Schering that these reforms represented.

At this session, the mediator was instrumental in assisting the parties in reaching agreement on certain aspects of the proposed Settlement that the parties had not yet been able to resolve on their

8

own, including (i) the five year duration for the Company's commitment to maintain key aspects of the governance and compliance reforms in place at Schering; (ii) the Company's treasury commitment to fully fund these reforms for the full five year commitment period; and (iii) the Company's agreement to permit the head of Global Compliance to bypass the normal budgeting processes and limitations and solicit additional funding as needed directly from the Board. *See* Section III.C. below.

Only after the parties reached agreement in principle on *all* material terms and conditions of the proposed Settlement did the mediator oversee negotiations between counsel for plaintiffs, defendants and Schering's directors' and officers' insurance carriers regarding Plaintiffs' Counsel's request for attorneys' fees and reimbursement of expenses. At the request of the mediator, Plaintiffs' Counsel provided a detailed mediation submission that included a breakdown of hours and lodestar by specific category of work performed by each of Plaintiffs' Counsel's law firms, expenses incurred to date in litigating the Derivative Actions, and an analysis of relevant case law addressed to the standards for the consideration of an appropriate fee award. *See* Infante Decl. ¶¶ 28-29.

Over the course of late January and February 2007, the mediator worked with counsel for plaintiffs, defendants and the Company's directors' and officers' insurance carriers, both in-person and by telephone. As the result of this contentious and arm's length process, all parties were able to arrive at the negotiated amount, subject to Court approval, of $9.5 million in attorneys' fees and an amount not to exceed $300,000 for the reimbursement of expenses, to be funded in full by the Company's insurance carriers. *See* Infante Decl. ¶ 32.

By Order of the Court dated May 31, 2007, plaintiffs filed a Joint and Consolidated Second Amended Shareholder Derivative Complaint (the "Second Amended Complaint"), which joined

9

Messrs. McCarthy and  Prager as additional demand futility plaintiffs[7] and Dr. Sherr as demand

plaintiff, and consolidated into the single pleading both the demand futility claims of the Demand

Futility Litigation and the claims relating to the Demand Letter.

## III.    SUMMARY OF PROPOSED RELIEF

As a result of their overall investigation and analysis, Plaintiffs' Counsel came to several key

conclusions, including:

- The Company's compliance systems were completely siloed – segregated by operating or business unit. There was no effective centralized mechanism for reporting, overseeing or investigating compliance with legal or regulatory standards enterprise-wide.

- What compliance functions existed were largely controlled by the relevant business unit.  No compliance system functioned independent of the business units.  This created a risk that compliance would lack the ability to buck management priorities within business units.

- As events unfolded and senior management was advised of emerging issues, the Company lacked an independent system for assessing the scope and magnitude of the problems and thus was not in a position to respond sufficiently promptly or effectively to regulatory concerns.

- The Company lacked sufficient infrastructure to support proactive Board oversight in the critical area of compliance.  This lack of infrastructure included the absence of a global compliance function, robust operational audit or effective risk assessment capacity.

- Finally, there was inadequate process in place to assess the fast changing regulatory landscape in which the Company operated, to identify, evaluate and manage future operational risk and to ensure appropriate resources were allocated and properly directed.

Plaintiffs' Counsel believed that for meaningful change to occur at Schering, a top-down

cultural change, supported by best-in-class Board and management level governance, internal control

---

[7]   Law Offices of Bruce G. Murphy PC, as a counsel for Mr. McCarthy, become one of Plaintiffs' Counsel at this time.

and compliance reforms, was required. Plaintiffs' Counsel further believed that in order for any proposed governance and compliance reforms to be effective at identifying and preventing violations of law, regulation and Company policy, they would require substantial, and often complementary, changes at both the Board and management level. In plaintiffs' view, to provide the most effective oversight possible, the Board would need to be fully informed of relevant information in a timely manner. Plaintiffs' Counsel's goal of ensuring effective information flow to the Board raised a corresponding requirement for management, first, to have processes in place to identify and uncover such information, and, second, to make it available to directors in a timely and complete manner. The proposed Settlement achieves both of these goals. Provided below is a short discussion of the structural framework of the corporate governance and compliance changes provided for by the proposed Settlement and a summary of certain key provisions. Exhibit A, setting forth the corporate governance and compliance revisions in their entirety, describes the detailed structural framework for the implementation and/or maintenance of these provisions pursuant to the proposed Settlement, including, as appropriate, specific processes, reporting obligations, oversight responsibilities and funding commitments.

As set forth in more detail in Exhibit A, the detailed recommendations made by Plaintiffs' Counsel on each of the corporate governance and compliance subjects discussed herein, along with the Derivative Actions and the negotiations concerning their resolution, were a substantial factor in the design and implementation of the changes adopted by the Company. (In a few limited instances specified in Exhibit A, plaintiffs were a factor, rather than a substantial factor, in the design and implementation of the corporate governance and compliance changes.)

11

## A.   Management Level Governance and Compliance Reforms

### 1.   Centralized Independent Global Compliance

At the management level, the proposed Settlement reflects the creation of a centralized global compliance function. Schering has created a new position – the Senior Vice President, Global Compliance and Business Practices or SVP-GCBP – and centralized the compliance function under this position. This crucial reform, advocated by Plaintiffs' Counsel from the initial January 2003 meeting, laid the groundwork, in plaintiffs' view, for essential changes with respect to senior management oversight and the adoption and implementation of substantive systems, including compliance audit and risk management. The proposed Settlement also contains procedures designed to ensure the independence of compliance functions from business line functions while sufficiently integrating such compliance to ensure adequate understanding of the business activities so as to permit effective performance of the compliance role.

### 2.   Restructured Senior Management Compliance Oversight

The proposed Settlement also reflects another proposal Plaintiffs' Counsel pressed for beginning early in the negotiation process – the reorganization of Schering's senior management compliance oversight function, placing compliance oversight responsibility within the management level with the most senior level managers, ensuring the transparency and accountability Plaintiffs believe is a crucial element of compliance reform. In this way, management level oversight of compliance has been streamlined and elevated to the highest levels of management under the purview of the Executive Management Team.

12

### 3.    Robust Operational Audit Function

The Settlement provides for the Board election of an overarching internal audit executive, the Vice President-Global Internal Audit (VP-GIA).   This officer, specifically charged with responsibility for compliance audit design and implementation, reports to the SVP-GCBP, with reporting responsibilities to the Business Practices Oversight Committee of the Board (the "BPOC"). One of the internal audit functions under the purview of the VP-GIA is operational compliance audit. From the beginning of the settlement negotiations, Plaintiffs' Counsel consistently stressed the importance of a robust operational audit function, designed to provide a formal process to test the effectiveness of Company compliance functions and policies as they are being implemented and run at Schering.   It is in part on the basis of this evaluation that the Board is then able to assess the adequacy of the compliance systems on at least an annual basis.   *See* Section III.B. below.

### 4.    Conduct of Investigations

Meeting another proposal advocated by Plaintiffs from early in the negotiation process, Schering has created an independent investigative function housed within the global compliance function, responsible for compliance-related internal investigations.   This investigative function operates under the direction of the Vice President-Corporate Compliance, who reports to the SVP-GCBP.   Findings of this investigative function are reported directly to the BPOC as appropriate. This function will help increase the transparency and timely reporting to both senior management and the Board of the compliance issues these investigations raise throughout the Company. Importantly, Schering has committed to fully support with adequate funding and resources this investigative function as part of the proposed Settlement.

13

### 5.    Piloting of Enterprise Risk Management Techniques

The Settlement reflects Schering's piloting of enterprise risk management techniques and processes, including vesting responsibility for this function with the SVP-GCBP. Enterprise risk management was another compliance reform of particular importance to Plaintiffs' Counsel from early in the settlement process, and was the subject of a formal "white paper" provided to the Company in early 2004.

### B.    Board Level Governance and Compliance Reforms

At the Board level, the parties addressed multiple issues related to Board structure and function. These detailed provisions are set forth at Sections A.1. through A.14. (pages 1 through 20) of Exhibit A to the Stipulation and address the Board's independence and membership qualifications, the Board's compliance oversight role, and the Board's practices with respect to voting, election, compensation, director training, and education, as well as the role of non-management directors. These were all areas of concern to plaintiffs throughout the settlement process, and were the subject of specific proposals in Plaintiffs' Corporate Governance Plan given to Schering in October 2003. As with the management level reforms, Schering adopted governance and compliance reforms at the Board level over the course of the negotiation process.

Schering has, for example, adopted independence standards which exceed New York Stock Exchange guidelines, increased reporting on compliance-related matters to the Board or Board committees, and improved compliance-related director education and training practices. The Settlement further reflects each of the following critical reporting components:

* review at least annually by the BPOC of the non-financial and operational audit aspects of the internal auditor's annual integrated global audit plan prior to its implementation;

14

- at least annual reporting to the BPOC of significant findings of the non-financial and operational audit aspects of the integrated global audit;

- immediate reporting to the chair of the BPOC or other appropriate committee of egregious findings identified in the course of the integrated global audit;

- reporting to the BPOC of significant internal investigative matters relevant to the BPOC's compliance-oversight role;

- review of the allocation of resources, including the retention of outside advisors or experts, as appropriate;

- annual assessment by the BPOC of the adequacy of information flow it receives; and

- regular attendance at BPOC meetings by officers of the Company from a variety of relevant disciplines such as compliance, audit or legal.

### C.     Other Provisions of the Proposed Settlement

In addition, the proposed Settlement also provides for:

- maintaining in place key aspects of the governance and compliance provisions of the Settlement for the Five Year Commitment Period.  Certain Board level changes are reflected in amendments and changes to the Company's Guidelines, By-Laws and Board committee charters;

- the Company's agreement that, for the Five Year Commitment Period, it will commit from its treasury all funds as are necessary to fully implement the corporate governance and compliance related commitments provided for in the Settlement; and

- the Company's agreement that if, during the Five Year Commitment Period, the senior compliance officer at Schering (presently the SVP-GCBP) wishes to seek additional funding for compliance-related expenditures, he or she will be permitted at his or her option to petition directly to the Board or an appropriate committee of the Board that such funding be included in, or covered by, business plans and budgets that are approved by the Board or such committee.

## IV.   PLAINTIFFS' EXPERTS FULLY SUPPORT THE PROPOSED SETTLEMENT AS REFLECTING "BEST-IN-CLASS" GOVERNANCE AND COMPLIANCE PRACTICES AT SCHERING

Plaintiffs retained Professor Donald C. Langevoort, the Thomas Aquinas Reynolds Professor of Law at Georgetown University Law Center in Washington, D.C., widely regarded as an expert in the fields of securities regulation, corporate governance and corporate behavior, and Mr. James Lam, President of James Lam & Associates, who has over twenty-five years of industry and consulting experience in the field of risk management. Based on their independent analysis of the proposed Settlement and relevant supporting materials, these experts each separately concluded that the terms of the Settlement are extensive and wide-ranging, helping to provide best-in-class governance and risk management practices at Schering. *See, e.g.*, Langevoort Decl. ¶ 4. Mr. Lam concluded:

First, the terms of the Settlement are far-reaching and would establish best-in-class governance and risk management practices at Schering. Second, the Settlement would significantly enhance the governance structure and effectiveness at the Board level. Third, the Settlement would significantly enhance the effectiveness of risk management processes and internal controls at the management level. Fourth, the Company should realize significant financial benefits in connection with the Settlement.

Lam Decl. ¶ 5.

As reflected in the Course of Negotiation memorandum (pages 13-17), one emphasis in the governance and compliance reforms at Schering that Plaintiffs' Counsel advocated from the beginning of the settlement negotiations was to enhance Board oversight. The proposed Settlement reflects this concept, including through the provisions relating to the BPOC, seeking to make it a proactive committee that not only oversees those with day-to-day compliance, audit and ethics tasks, but also monitors the effectiveness of those functions. *See* Langevoort Decl. ¶ 16.

16

Reflecting the strong inter-relationship between the Board and the management level reforms,

Professor Langevoort found:

> Crucial to strengthening of the Board's oversight function are the significant structural reforms undertaken at the management level, including the adoption of management-level reforms to support the Board's strengthened compliance oversight, described below, such as creation of the centralized global compliance function, the integrated global audit function and use of enterprise risk management tools. These structures and processes are designed to provide the depth and timeliness of the information flow, both to support the Board's oversight and provide a substantively strong compliance system to detect and prevent future violations of law, regulation and Company policy.

Langevoort Decl. ¶ 17.

Professor Langevoort recognized that the 'best-in-class' governance and compliance reforms

reflected in the Settlement that were implemented at Schering on a real time basis "were particularly

innovative and forward-looking at the time" they were being implemented. Langevoort Decl. ¶ 13.

*See also*, Langevoort Decl. ¶ 36; Lam Decl. ¶ 10 fn.2.

Responding to one of Plaintiffs' Counsel's principal concerns from the beginning of the

negotiations in early 2003 – the lack of a streamlined, centralized and independent compliance

function – Schering has centralized its global compliance and audit functions in the office of the

SVP-GCBP, thereby eliminating the more fragmented (or 'siloed') compliance oversight process

previously in place. Professor Langevoort found that this reform achieved the important goals of

separation of compliance and audit from the operating units, and centralization of information flow

regarding compliance issues so that a comprehensive evaluation of compliance and audit risks is

possible. *See* Langevoort Decl. ¶ 23. *See also* Lam Decl. ¶ 23 ("This was a critical and substantial

undertaking, moving the Company virtually wholesale away from its siloed control processes to an

17

independent global compliance function accountable for compliance design and implementation for SGP's worldwide operations.")

Mr. Lam also found significant the Settlement provision regarding the conduct of internal investigations.  Provision B.4. of Exhibit A provides for the creation of an investigative function directed by the Company's Vice President-Corporate Compliance, with responsibility over, *inter alia*, compliance-related internal investigations.  The Settlement requires that this function be fully supported with adequate funding and resources.  Regarding this provision, Mr. Lam noted:

> In my assessment, key benefits of placing compliance-related investigations under Global Compliance and Business Practices include appropriate, continuous and transparent information flow up through the organization to the board, as part of a system of effective checks and balances.  In addition, Global Compliance and Business Practices should be able to leverage its in-depth knowledge of SGP's operational processes and systems, as well as prior audit findings, to conduct more thorough investigations.  Housing this investigative function in Global Compliance and Business Practices is a significant step.

Lam Decl. ¶ 29.

Mr. Lam highlighted at least three major benefits to Schering of the proposed Settlement going forward.

- First, the "sweeping structural compliance reforms Schering has adopted, or has agreed to adopt, should be expected to significantly reduce the likelihood of future exposure to the [such] expenses".  Lam Decl. ¶ 37.

- Second,"the Settlement will strengthen investor confidence and, critical to Schering as a pharmaceutical company, significantly enhance regulatory relationships."  Lam Decl. ¶ 38.

- Third, "[t]here is a wide body of empirical, research, and survey data that support the conclusion that companies with effective governance, risk, and compliance programs experience higher levels of profitability and market valuation," "the terms of the Corporate Governance and Compliance Provisions [under the Settlement in Schering] go beyond the practices used in the above studies" and "the financial benefits shown by the [that] data would translate into substantial financial benefits to Schering and its shareholders."  Lam Decl. ¶¶ 40, 43- 44.

18

Mr. Lam's conclusion provides further support for the scope and nature of the benefits to

Schering as the result of the proposed Settlement:

> In summary, my assessment is that, as reflected by the Corporate Governance and
> Compliance Provisions, the Company undertook sweeping compliance reforms at a
> time when these reforms were not widely accepted. The Corporate Governance and
> Compliance Provisions are far-reaching, and establish and will continue best-in-class
> practices in governance, risk, and compliance at Schering. . . . The terms of the
> Settlement place the Company at the forefront of sound corporate governance and
> risk management practices.

Lam Decl. ¶ 46.

\* \* \*

As detailed above, the governance and compliance proposals set forth at Exhibit A to the

Stipulation are wide-ranging and were particularly cutting edge when they began to be implemented

over the course of the settlement negotiation process, beginning in late 2003 and 2004. Beyond this,

the agreed-upon changes go substantially beyond anything required legally or by Schering's

government settlements.[8] Unlike situations where plaintiffs benefit from the government's efforts,

in this case the expansive compliance changes reflected in the Settlement – implemented at Schering

on a rolling basis over the course of the negotiations – acted to benefit the Company in connection

with its dealings with the government in seeking to resolve the then-outstanding investigation by the

U.S. Attorneys' Office in Boston. *See, e.g.*, Course of Negotiation memorandum, page 2. In

addition, the Corporate Integrity Agreement, entered into as part of the July 2004 settlement with the

Philadelphia U.S. Attorney's Office, was premised on, inter alia, governance and compliance efforts

already undertaken by the Company – significant aspects of which Plaintiffs' Counsel were a

---

[8]   The Course of Negotiation memorandum details, where applicable, relevant regulatory or legal
requirements and how the proposals offered and the provisions agreed upon in the proposed Settlement
exceed those requirements.

substantial factor in implementing – including, for example, the establishment of a voluntary compliance program (known as "Global Compliance and Business Practices"), the appointment of a senior vice president Global Compliance Officer with specifically designated duties and responsibilities and the creation of the Executive Management Team.

## V.    THE APPLICABLE LEGAL STANDARDS

### A.    Settlements are Generally Favored

There is an overriding public interest in settling and quieting litigation, and this is particularly true in complex litigation. *See, e.g., In Re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 535 (3d Cir. 2004); *In Re GMC Pick-up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 784 (3d Cir. 1995) *cert. denied,* 516 U.S. 824 (1995*)* ("the law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation"). This strong public policy in support of settlement applies with even greater weight to derivative litigations. *See e.g., Maher v. Zapata Corp.,* 714 F.2d 436, 455 (5th Cir. 1983) ("Settlement of shareholder derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable.'" (citations omitted)).

Recognizing that a settlement represents an exercise of judgment by the negotiating parties, courts have consistently held that the function of a judge reviewing a proposed settlement is neither to rewrite the settlement agreement reached by the parties nor to try the case by resolving issues left unresolved by the settlement itself. *See e.g., Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799, 804 (3d Cir.) *cert. denied,* 419 U.S. 900 (1974); *Bullock v. Administrator of the Estate of Kircher,* 84 F.R.D. 1, 4 (D.N.J. 1979).

20

## B.     Factors Courts in this Circuit Routinely Consider
##        In Assessing Whether to Grant Final Approval

Rule 23.1 of the Federal Rules of Civil Procedure requires court approval for the settlement

of a derivative claim.  The Third Circuit has found that the principal factor in determining the

fairness of a derivative settlement is "the extent of the benefit to be derived from the proposed

settlement by the corporation, the real party in interest." *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d

Cir. 1978).[9]  Other factors relevant to assessing proposed settlement of complex litigations include:

> (1) the complexity, expense and likely duration of the litigation. . .; (2) the reaction
> of the class to the settlement. . .; (3) the stage of the proceedings and the amount of
> discovery completed. . .; (4) the risks of establishing liability. . .; (5) the risks of
> establishing damages. . .; (6) the risks of maintaining the class action through the
> trial. . .; (7) the ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best possible recovery
> . . .; [and] (9) the range of reasonableness of the settlement fund to a possible
> recovery in light of all the attendant risks of litigation. . . .

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)(ellipses in original). *See also*, *Bell Atlantic*, 2

F.3d at 1311 (the *Girsh* factors are relevant to assessing final approval of a derivative settlement);

*Shlensky*, 574 F.2d at 147 ("the standards annunciated in *Girsh* . . . have accordingly been applied,

although perhaps with somewhat less rigor, in the settlement of shareholders' derivative suits").[10]

In exercising this discretion, courts in the Third Circuit also give considerable weight and deference

to the views of experienced counsel as to the merits of an arm's length settlement. *Automotive*

---

[9]   This assessment should be considered "in light of the best possible recovery, of the risks of establishing
liability and proving damages in the event the case is not settled, and of the cost of prolonging the litigation."
*Id.*

[10]   Courts recognize that the *Girsh* factors are only a guide for courts to consider, and not all need be met
in order for a settlement to be approved. *In Re Am. Family Enters.*, 2456 B.R. 377, 418 (D.N.J. 2000) (*Girsh*
factors are "a guide and the absence of one or more does not automatically render the settlement unfair").

*Refinishing Paint,* 2003 WL 23316645, \*2 (E.D.Pa. Sept. 5, 2003) ("Though the ultimate determination of the fairness of a partial settlement is left to the court, it is appropriate to give substantial weight to the recommendations of experienced attorneys, who have engaged in arms-length settlement negotiations, in making this determination.").

As discussed below, consideration of those factors relevant to derivative litigation demonstrates that the proposed Settlement is fair, reasonable and adequate, and strongly supports its final approval at this time.

## C.       Assessment of the Proposed Settlement under the Relevant Factors for Consideration in a Derivative Settlement

### 1.       The Extent of the Benefit Derived by Schering from the Proposed Settlement

Courts have long recognized that in derivative actions, non-monetary benefits, such as material changes in corporate management or policies, provide real and substantial benefits and settlements based on such benefits warrant approval. *See, e.g. Mills v. Electric Auto Lite Co.,* 396 U.S. 375, 397-398 (1970). Thus, Judge Cavanaugh in this district recently recognized "the great benefit conferred upon Shell as a result of the new corporate governance principles provided for in the settlement agreement" that "will serve to prevent and protect Shell from the reoccurrence of certain alleged wrongdoings." *Unite Nat'l Ret. Fund v. Watts*, 2005 U.S. Dist. LEXIS 26246 \*18 (D.N.J. Oct. 28, 2005) ("*Shell*"). Likewise, the court in *In Re AOL Time Warner Shareholder Derivative Litigation*, after discussing the role the derivative litigation played in assisting the company to recover insurance proceeds, went on specifically to find:

> *Even more importantly*, the governance and compliance provisions memorialized in the Settlement directly address the failure of internal controls that precipitated the

instant lawsuits.  The preventive aspects of these provisions is itself a significant benefit of the Settlement."

*Id.*, 2006 WL 2572114, \*4 (S.D.N.Y. Sept. 6, 2006).  (Emphasis added.)

As reflected in the Stipulation, and evaluated in the declaration of each of plaintiffs' experts (*see* Section IV, *infra*), the scope and nature of the corporate governance and compliance relief to Schering are wide-ranging and act to help position Schering "at the forefront of sound corporate governance and risk management practices."  Lam Decl. ¶ 46.  Both Professor Langevoort and Mr. Lam highlight that, in their expert opinions, the proposed Settlement sets forth best-in-class compliance and governance reforms at both the Board and management levels at Schering.  These reforms, specifically tailored to Schering's operations and structure, include, *inter alia*, an independent and centralized global compliance function, the piloting of ERM techniques, including "mapping" and "scoring" compliance risk by business lines, an integrated global audit function, and an array of measures designed to increase Board independence and oversight of non-financial operations, including compliance, audit and ERM.

The parties to the proposed Settlement believe that these reforms provide a substantial benefit to the Company, including in the prevention and detection of violations of law, regulation, or Company policy.  *See also*, Langevoort Decl. ¶ 39.  Moreover, reforms were implemented over the negotiation period, permitting the Company to benefit from them on a real time basis, including in the resolution of a long-standing government investigation.  *See* Exhibit A, page 1; Course of Negotiation memorandum , page 2; Lam Decl. ¶ 38.

Mr. Lam specifically discusses at least three major benefits to Schering from the proposed Settlement: (i) the reduced likelihood of future exposure to adverse regulatory actions (Lam Decl.

23

¶ 37); (ii) enhanced investor and regulatory confidence, which will have a direct impact on such critical functions as "easing the approval and introduction of new products and thereby reducing development costs and moving drugs more rapidly to market" (*id.* ¶ 38); and (iii) "substantial financial benefits to Schering and its shareholders" as the result of the governance, risk, and compliance programs reflected in the proposed Settlement. *Id.* ¶¶ 40-44.

Moreover, keys aspects of the governance and compliance provisions in the Settlement must be maintained and fully funded by the Company for at least five years going forward. In addition, pursuant to the proposed Settlement, if, during the Five Year Commitment Period, the senior compliance officer at Schering wishes to seek additional funding for compliance-related expenditures, he or she shall be permitted at his or her option to petition directly the Board or an appropriate committee of the Board that such funding be included in, or covered by, business plans and budgets that are approved by the Board or such committee.

The proposed Settlement thus provides substantial benefits to Schering and its shareholders. As such, the most important factor with respect to the approval of derivative settlements – *i.e.*, benefit to the company – weighs strongly in favor of approval.

> **2.      The Risks of Establishing Liability, Damages, and Maintaining the Action through Trial, and the Concomitant Complexity, Expense, and Likely Duration of the Litigation**

In evaluating the settlement of a derivative action, courts have long recognized that such litigations "are notoriously difficult and unpredictable." *Maher,* 714 F.2d at 455. *See also*, *Shell*, 2005 U.S. Dist. LEXIS 26246 at *10 ("Derivative suits are by their nature undeniably complex.") Had this case gone forward, plaintiffs recognize that they would face substantial risks. These risks include a judicial determination that the findings of the Evaluation Committee merit business

24

judgment deference, or the creation of a new special litigation committee, whose results could trigger the protections of the business judgment rule presumption.

In addition, derivative litigation raises other procedural hurdles and risks for shareholders not found in either class or securities litigation, including, *inter alia*: (i) the requirement to make a demand on the board before proceeding to file a complaint or face heightened pleading requirements to demonstrate such demand should be excused; (ii) the effect on defendants' liability of the indemnification provisions contained in corporate by-laws; (iii) whether each individual defendant breached his or her fiduciary duties; (iv) whether causation and damages can be established with respect to each individual defendant; and (v) whether insurance would ultimately cover any claims brought by derivative plaintiff. *See e.g.*, *In Re Cendant Corp. Derivative Action Litig.,* 232 F. Supp 2d 327, 333 (D.N.J. 2002) ("*Cendant Derivative*").

In addition to uniquely derivative risks, plaintiffs faced risks inherent in any complex litigation, including factual and legal issues that were technical in nature, requiring extensive expert analysis and establishing liability in the face of conflicting testimony and evidence. Should plaintiffs' claims have survived to proceed to trial, a jury would have been presented with each individual defendants' portrayal of his or her responses to the unfolding problems the Company confronted as reasonable and appropriate under the circumstances, and their complete denial of any wrongdoing. Plaintiffs' claims would also be subject to the unpredictability of a lengthy and complex jury trial, the possible unavailability of witnesses, and the possibility that jurors could react to the evidence in unforeseen ways. Should plaintiffs have prevailed on liability, they would continue to face substantial hurdles in demonstrating and quantifying damages, with any such showing likely ending up as a battle of competing experts – a situation fraught with unpredictability.

In negotiating the proposed Settlement, Plaintiffs' Counsel, while believing they had powerful arguments and evidence to overcome these hurdles, were nonetheless fully aware of the material risks of continuing to litigate this action, particularly when weighed against the immediate and tangible benefits conferred upon the Company by the proposed Settlement. Litigating these claims to trial and on appeal would entail substantial costs and impose material burden on plaintiffs and the Company. Instead of the risk of failing to obtain any benefit for Schering through costly and time-consuming litigation, the proposed Settlement allows Schering to put these matters to rest and to go forward armed with best-in-class corporate governance and compliance practices.

The litigation risks discussed above reinforce the conclusion that the comprehensive proposed Settlement falls within the "range of reasonableness." *See, e.g.*, *Newman* v. *Stein,* 464 F. 2d 689, 693 (2d. Cir. 1972) (the range of reasonableness of a settlement "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion"). *See also Walsh* v. *Great Atlantic & Pacific Tea Co.*, 96 F.R.D. 632, 642 (D. N.J.), *aff'd*, 726 F.2d 956 (3rd Cir. 1983).

### 3.   The Stage of the Proceedings, the Amount of Discovery Completed and the Opinion of Counsel

During this litigation, Plaintiffs' Counsel have had ample opportunity to fully investigate Plaintiffs' claims – including through the review and analysis of over 600,000 of pages of documentary production; intensive factual and legal research and analysis in support of the pleadings filed in this action; the review and synthesis of deposition discovery; the coordination of merits-based legal research; and the preparation of multiple submissions to the mediator – to arrive at a well-reasoned determination of their strengths and weaknesses, and to assess the reasonableness of

26

the proposed Settlement. Based on this analysis, Plaintiffs' Counsel – sophisticated counsel experienced in complex and derivative litigation – strongly supports the settlement. Counsel's opinion regarding the proposed Settlement should be given "considerable weight and deference" by the Court when assessing "the merits of an arms-length settlement." *Automotive Refinishing*, 2003 WL 23316645, at *2. *See also*, Stipulation, provision O, pages 5 ("Based on their review and analysis of the relevant facts and controlling legal principles, Plaintiffs' Counsel and the Settling Defendants believe that the Settlement set forth in this Stipulation confers substantial benefits upon, and is in the best interests of, Schering.").

### 4.   The Reaction of Schering Stockholders to the Settlement Supports Approval

Out of a total of over 320,000 individual Settlement Notices sent out, and with the benefit of publication notice in both *The Wall Street Journal* and *Investors' Business Daily*, seventeen Schering shareholders have sent letter objections.[11]   Copies of these letters are provided in alphabetical order at Exhibit 1 hereto. As detailed below, Plaintiffs' Counsel respectfully submit that these objections are without merit.[12]

Professor and Mrs. Curtis Verschoor lauds the corporate governance and compliance benefits provided to Schering under the proposed Settlement. Professor Verschoor's opinion reflects his special expertise in the areas of governance and ethics. Professor Verschoor was the Ledger & Quill

---

[11]   Ms. Blain does not expressly object, but rather wrote to state that she would like to attend the Final Settlement Hearing "to gain greater insight of the details of the hearing," and raised an issue unrelated to this litigation ("I believe I have evidence in behalf of Sharing [sic] Plough re: Dividend & disbursement of checks.").

[12]   Objections regarding the payment of attorneys' fees and reimbursement of expenses are discussed separately at page 47 below.

Research Professor, School of Accountancy, DePaul University, Chicago, Illinois. Professor Verschoor provided expert testimony in several of the Enron non-class action civil cases on the subjects of governance, ethics, internal and external auditing. Professor Verschoor has been a long-term shareholder of Schering, having held over 3,300 shares for more than ten years. In 2001, Professor Verschoor's article, *Alleged Unethical Behaviors and Schering Plough* (published in the July 2001 issue of *Strategic Finance*, Vol. 83, Issue 1, page 18) criticized the Company, particularly with respect to alleged ethical issues. Based on his review of the detailed terms of the settlement, however, Professor Verschoor has concluded:

> For at least the five-year period, the board of directors of Schering-Plough will certainly be counted among the world leaders in areas of governance, such as independence, membership qualifications, ethics and compliance. These positive attributes should have positive consequences for all stakeholders of Schering-Plough Corporation. My research that shows a linkage between corporate responsibility and a commitment to ethics on one hand and superior financial performance on the other has been widely quoted around the world, most recently in the Conference Board's *Corporate Governance Handbook 2007: Legal Standards and Board Practices*.

A copy of Professor Verschoor's letter and his article regarding Schering Plough are both provided at Exhibit 2hereto.

The Third Circuit has long recognized that the absence of any substantial opposition is indicative of class approval of a proposed settlement. *See e.g.*, *Bell Atlantic*, 2 F.3d at 1313-14 n.15 (holding that small proportion of objectors constituted tacit consent to settlement); *Stoetzner v. United States Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (concluding that when only 10% of the class objected, the response of the class as a whole "strongly favors settlement"). The fact that only a small number of objections were received here fully supports final approval of the proposed Settlement.

28

Some of the objections received address specific terms of the settlement or reflect a misunderstanding of the nature of a derivative claim.[13]  Ms. Roberta Schmitz objects to the discontinuation of staggered elections of directors in favor of annual elections of all directors.[14] Professor Langevoort expressly finds that the elimination of the staggered Board – with its potential for director entrenchment – is one of "a number of changes designed to make the directors more accountable to company shareholders," and that "research indicates that, on average, such entrenchment [from a staggered board] and anti-takeover provisions reduce shareholder value, so that it is reasonable to assume that their elimination at Schering would benefit the company's shareholders."  Langevoort Decl. ¶ 33.  Moreover, as reflected at Exhibit A to the Stipulation, (provision A.6.), the decision to eliminate the staggered board was approved by shareholder vote at the Company's 2006 Annual Meeting.

---

[13]  Two of the letters reflect an apparent misunderstanding of the nature of the claims raised and/or the scope of the release encompassed by the proposed Settlement.  Mr. Welden mistakenly believed this to be a 10(b) securities class action.  Mr. Block incorrectly argues that the underlying breach of fiduciary duty allegations state a 10b-5 claim, and expresses concern that the proposed Settlement acts to bar or release 10b-5 claims against Schering.  The claims raised in the Derivative Actions are derivative in nature, and paragraph 1.16 of the Stipulation expressly provides that: "Nothing in this Stipulation of Settlement is intended, or shall operate, to release the securities claims asserted in the Consolidated Amended Class Action Complaint in In re Schering-Plough Corp. Securities Litigation, Master File No. 01-00829 (D.N.J.) (KSH)."

[14]  Mrs. Schmitz states that "Annual elections of directors is not the way to run a corporation.  One year is not enough time on a board and staggered elections are needed for continued corporate memory."

Four letters, from Ms. Haus,[15] Mr. and Mrs. Plog, Mr. Stebbins[16], and Mr. McLanahan, object to the adequacy of the proposed Settlement because, from their perspective, it does not redress harm to the Company, fails (as the Plogs' believe) to provide punishment for past misfeasance or deterrence for future misconduct, or (as Mr. McLanahan believes) only benefits Company directors and officials, and not Schering shareholders. Ms. Haus goes on to call the Settlement terms "fluff." However, as set forth above and fully supported by the record plaintiffs have submitted, the wide-ranging nature of the governance and compliance relief reflected in Exhibit A provides a substantial benefit to the Company that is extraordinary in our experience. The impact plaintiffs were able to have on the restructuring of the Company's governance and compliance systems and the reforms that evolved from the process in which the parties engaged go to the heart of the compliance failures that plaintiffs allege underlay the Derivative Actions, and provide the capacity for detection and deterrence that are central to the experts' findings regarding the proposed Settlement.

Contrary to the Plogs' belief, the reforms undertaken were not "a natural consequence of and response to the exercise of Federal oversight and responsiveness to shareholder concern already in evidence according to the record," but rather address an entirely different level and scope of reform than that addressed in – and go substantially beyond anything required by – the government settlements, and assisted the Company in resolving a long-standing government investigation. *See,*

---

[15]  To the extent Ms. Haus' letter complains of the lack of any cash payment directly to shareholders under the proposed Settlement, this reflects apparent confusion on her part regarding the difference between derivative and securities class action litigation. The letter from Mr. Graubart shares this same apparent confusion, as he asks the Court "Please consider requiring that ALL shareholders get what's due to them – or that their 'small' portions go to charity."

[16]  Mr. Stebbins states that "It appears to me that the stockholders receive nothing but platitudes".

30

*e.g.*, Exhibit A, provision A.12.b., Course of Negotiation memorandum, page 2. The Company has recognized the important role Plaintiffs' Counsel played in this process:

> The detailed recommendations made by plaintiffs' counsel on each of the corporate governance and compliance subjects discussed herein, along with the Derivative Actions and the negotiations concerning their resolution, were a substantial factor in the design and implementation of the changes adopted by Schering-Plough ("SGP" or "Company") and set forth herein.

*See* Exhibit A to the Stipulation, page 1. The deterrent effect of the wide-ranging reforms accomplished here provides a substantial economic benefit to Schering. *See* Lam Decl. ¶¶ 40-43.

Finally, in their letters, Mr. Kuhn and Ms. Garretson apparently misapprehend the nature and purpose of derivative litigation.[17] Mr. Kuhn states that the governance and compliance relief reflected in the proposed Settlement are a usurpation of shareholder rights to oversee corporate governance and thus, that the "Settlement is not in the interests of either Schering-Plough or its shareholders."[18] This ignores the well established role derivative litigation can play on behalf of corporations (*see, e.g.*, Section VII.A and B below), and, as noted above, is directly contrary to the Company's representations and the experts' findings that the proposed Settlement provides substantial benefits to and is in the best interests of the Company and its shareholders.[19]

---

[17] Ms. Garretson states only that: "I am interested in fair and proper action of all employees at this company. If there was wrong doing I would like to see justice done."

[18] For the reasons detailed in Section VI. B. below, arguments raised by Messrs. Kuhn and McLanahan regarding the period of time within which to file objections are also without merit.

[19] Mr. and Mrs. Kolman and Mr. Wood also raise a concern about the possibility of named plaintiffs being paid to bring this action. Plaintiffs' Counsel note that there is no evidence that any payment whatsoever has ever been made or promised, nor shall be made, to any of the named plaintiffs in this case in connection with their filing or maintaining the Derivative Actions, and represent to the Court that no such payments have been or would ever be promised or made. *See* Attorney Settlement Decl. ¶ 56.

## VI.   THE NOTICE TO SCHERING SHAREHOLDERS IS ADEQUATE

### A.   Notice was Disseminated in Accordance with the Preliminary Approval Order

The approved forms of individual and publication notice to the Schering shareholders were disseminated in accordance with the Preliminary Approval Order. As detailed in the Affidavit of Stephen J. Cirami Regarding Distribution of the Settlement Notice (the "Cirami Aff."), in an effort to expedite notice, Plaintiffs' Counsel worked with the Notice Administrator, the Garden City Group ("GCG"), to collect names and addresses of Schering shareholders in advance of preliminary approval. See Cirami Aff ¶ 6; Attorney Settlement Decl. ¶ 60. The Court entered the Preliminary Approval Order on November 7, 2007. As the result of the efforts undertaken in advance of preliminary approval, over the course of November 8 and 9, 2007, GCG was able to make first class mailings of copies of the approved Settlement Notice directly to 254,261 Schering shareholders. In addition, GCG sent 28,145 copies to brokerage firms for their direct mailing to Schering shareholders, and 2,722 copies to brokerage firms, banks, and institutions and other nominees. Cirami Aff ¶¶ 10-12. Thereafter, as the Notice Administrator received additional broker requests providing lists of names and addresses of shareholders, it has mailed out Notice packets by first class mail, with an average turn-around time of 2-3 business days. Cirami Aff. ¶ 17. In total, GCG mailed out over 320,000 individual Settlement Notices. Cirami Aff. ¶ 18.

The approved Settlement Notice contains a detailed description of the nature and procedural history of the Derivative Actions, the terms of the Settlement and claims that will be released in the Settlement, and provides a detailed description of the benefits to the Company of the proposed

Settlement. The Settlement Notice further advises Schering shareholders of their right to object to the Settlement by filing written objections no later than November 28, 2007.

In addition, a copy of the approved Summary Notice was published in the national editions of *The Wall Street Journal* and *Investors Business Daily* on November 15, 2007 (Cirami Aff. ¶ 16), and GCG set up a toll-free call in center for the purpose of allowing Schering shareholders to access general information about the Settlement and to request a copy of the Notice. Cirami Aff. ¶ 13-14. Between November 9 and 27, GCG received and responded as appropriate to a total of 245 calls from Schering shareholders to the call in center. Cirami Aff. ¶ 15.

**B.     The Notice Procedures Fully Satisfied Due Process**

Rule 23.1 of the Federal Rules of Civil Procedures requires notice be given to shareholders in derivative actions "in such manner as the court directs." The notice process detailed herein fully satisfies the requirements set forth by this Rule, the Preliminary Approval Order, and due process. *See Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 314 (1950) (notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the [settlement] and afford them an opportunity to present their objections").

The Settlement Notice approved by the Court informed Schering's shareholders that a hearing to determine whether to approve the proposed Settlement would be held on December 11, 2007, summarized the litigation, including its procedural history, the parties' contentions, the reasons supporting the proposed Settlement, and the terms of the Settlement agreement. The Settlement Notice also informed shareholders that as a part of the Settlement, the parties have agreed that plaintiffs' counsel will seek an award of attorneys' fees of $9,500,000 and reimbursement of expenses not to exceed $300,000, which amounts were the subject of arm's length negotiation

33

between the parties pursuant to formal mediation, and advised Schering shareholders of "their right

to object, the consequences of not doing so, and how to go about obtaining further information,"

(*Bell Atlantic*, 2 F.3d at 1317 (holding similar notice in a derivative settlement to be adequate under

Rule 23.1)), specifically by noting the availability of the relevant documents at the office of the Clerk

of Court, or by request from Plaintiffs' Counsel, whose names and addresses were provided. *See id.*,

2 F.3d at 1317-1318 ("notice is not required to eliminate all occasion for diligence on the part of the

stockholders"); *Maher v. Zapata Corp.,* 714 F.2d 436, 452 (5th Cir.1983).

      The length of the notice period provided for in the Preliminary Approval Order, set by the

Court pursuant to its discretion under Fed. R. Civ. P. 23.1, is sufficient and in line with similar notice

periods approved in other derivative actions, where the primary purpose of notice is to notify

shareholders of a proposed settlement, and advise them of their right to object thereto and/or appear

at a fairness hearing. *See, e.g. In Re Bristol-Myers Squibb Derivative Litigation*, Master File No. 02-

CV-8571 (LAP) (S.D.N.Y., April 26, 2005) (17 days from entry of the Preliminary Approval Order

to the Final Settlement Hearing date) (Order attached as Exhibit 3 hereto); *Maher.*, 714 F.2d at 450

(23 day period between preliminary approval and settlement hearing); *Stassi v. Boone*, 2003 WL

21436995 (Tex. Dist. June 6, 2003)(19 day period between preliminary approval and final approval

hearing).

      As such, the Settlement Notice satisfies the "essential purpose to fairly apprise the

prospective members of the class of the terms of the proposed settlement and of the options that are

open to them," (*Bell Atlantic*, 2 F.3d at 1318), as well as to assist the Court by "encourag[ing] those

with divergent views to come forth." *Maher*, 714 F.2d at 451 n.27 (citations omitted).

## VII.  THE APPLICATION FOR FEES AND REIMBURSEMENT OF EXPENSES BY PLAINTIFFS' COUNSEL IS FAIR AND REASONABLE BASED ON ALL RELEVANT FACTORS

Plaintiffs' Counsel in the Derivative Actions respectfully request approval of an award of attorneys' fees in the amount of $9.5 million and reimbursement of expenses not to exceed $300,000.00.[20] As reflected in Judge Infante's Declaration and described in detail in the Declaration of Karen L. Morris in Support of the Award of Attorneys' Fees and Reimbursement of Expenses ("the Fee Declaration"), the fee agreement was arrived at following weeks of active and contentious negotiations under the auspices of the mediator. This process entailed both face-to-face sessions and multiple telephone conferences, involving not only Plaintiffs' Counsel and both in-house and outside Company counsel, but also the active participation of counsel for the Company's directors' and officers' insurance carriers. *See* Infante Decl. ¶¶ 29-31.

The fee award and expense reimbursement sought will be fully funded from the directors' and officers' insurance carriers. The carriers – as well as the Company – had every incentive to negotiate the lowest possible fee amount. Infante Decl. ¶ 31 ("As the entities that would fund the fee, the carriers took a highly active role in negotiating the amount of fees to which they and the Company would agree.") Schering supports both the proposed fee of $9.5 million and the reimbursement of expenses. *See* Stipulation, ¶ 5.1. Judge Infante also fully supports the proposed fee award:

> The agreed upon amount of $9.5 million plus expenses has been endorsed by the Company, based on the work plaintiffs' counsel undertook, the expertise they exhibited and the substantial impact they had. I am fully satisfied with the resolution the parties reached with respect to plaintiffs' counsel's compensation.

---

[20]  Plaintiffs' Counsel's expense amount for which they seek reimbursement is $298,351.61.

35

Infante Decl. ¶ 32.

Plaintiffs' Counsel respectfully submit that the requested fee and expense award is reasonable under the circumstances of this case, as measured against applicable legal standards, and is worthy of the Court's approval. As detailed herein, and fully reflected in the submissions before the Court, including the expert declarations, the proposed Settlement provides substantial benefits to Schering, including best-in-class corporate governance and compliance systems at both the Board and management levels. *See, e.g.*, Langevoort Decl. ¶ 39; Lam Decl. ¶ 46.

### A.      Applicable Legal Standards for Consideration of a Fee Request

Third Circuit legal precedent is clear that the trial court has discretion in the determination of an appropriate award of attorneys' fees in the context of representative litigation such as class or derivative actions. *See, e.g., Zucker v. Westinghouse Elec. Corp.*, 265 F.3d 171, 175 (3d Cir. 2001). Courts assessing payment of attorneys' fees in cases where the relief is therapeutic (or not in the form of cash) apply the "substantial benefit doctrine" (described below), to determine whether the proposed settlement provides a "substantial benefit" sufficient to support the requested award of attorney's fees. Depending on the specific facts of the proposed settlement consideration, the Court may then apply a lodestar analysis, or consider a percentage of the benefit analysis to the determination of an appropriate fee award. Courts in this Circuit take into consideration, as well, the fact that a fee has been agreed upon by opposing parties in an arm's length process. Plaintiffs' Counsel respectfully submit that the  attorneys' fee and reimbursement of expenses requested is reasonable under each of the assessment methodologies.

36

### B.   The Substantial Benefit Doctrine in the Third Circuit

Courts unanimously recognize that attorneys' fees should be awarded where a settlement reflects therapeutic or other non-monetary relief, so long as that relief is "substantial." *See, e.g.*, *Mills*, 396 U.S. at 397-98; *Merola v. Atlantic Richfield Co.*, 515 F.2d 165, 169-70 (3d Cir. 1975). As detailed herein, courts within the Third Circuit and elsewhere have consistently held that an award of fees is justified in nonmonetary settlements where plaintiffs have successfully negotiated changes in corporate governance and business practices that confer a substantial benefit on the nominal defendant corporation and, derivatively, its shareholders.

The present Settlement negotiations are virtually unprecedented in how they unfolded over an almost five year period. Beginning in January 2003, Plaintiffs' Counsel were actively involved in proposing sophisticated, detailed and substantial corporate governance changes at the Company. *See e.g.*, Exhibit A to the Stipulation, page 1, Course of Negotiation memorandum, page 1. The governance provisions set forth in Exhibit A – of which the detailed recommendations made by Plaintiffs' Counsel, along with the Derivative Actions and the negotiations concerning their resolution were a substantial factor (in limited instances, a factor) in the design and implementation – address significant changes in Schering's governance and oversight structure at both the Board and management levels, and have benefitted the Company in connection with governmental investigations. Plaintiffs' Counsel also negotiated additional substantial relief under the proposed Settlement. *See, e.g.*, Section III.C above. As detailed at Section IV above, both Professor Langevoort and Mr. Lam, based on their recognized expertise in the fields of corporate governance, compliance and risk management, fully support the proposed Settlement as providing substantial

benefits to Schering.  As Mr. Lam opined, the Settlement has provided and should continue to provide significant business and financial benefits to Schering.[21]  See Lam Decl. ¶¶ 35-46.

Reflective of the growing recognition by the courts of the critical importance of strengthening corporate governance and compliance systems, the District Court for the District of New Jersey awarded a fee of $9.2 million in *Shell*, 2005 U.S. Dist. LEXIS 26246 at *18.  The Court based its fee award on "the great benefit conferred upon Shell as a result of the new corporate governance principles provided for in the settlement agreement" that "will serve to prevent and protect Shell from the reoccurrence of certain alleged wrongdoing." *Id.*  The settlement included no monetary benefit or explicit funding commitment.  The governance relief obtained required Shell, a foreign-based corporation with significant assets in the United States, to adopt American-style governance and compliance standards, directed primarily at board level reforms.  Similarly, the District Court for the Northern District of Illinois in *In Re Abbott Laboratories Derivative Shareholder Litigation*, Case No. 99C7246 (N.D. Ill. Mar. 1, 2005) by Order dated March 1, 2005, awarded attorneys' fees in the amount of $9 million.[22]  (A copy of the Final Judgment and Order of Dismissal is attached at Exhibit 4 hereto).  The benefits obtained included a commitment by the Company to fund

---

[21]   Under the substantial benefit doctrine in the Third Circuit, in cases where the benefit is in non-monetary form, the district court brings an informed economic judgment to bear in assessing its value.  If probative evidence of the monetary value of such a benefit is available, it should of course be used.  If the benefit is not susceptible of being rationally reduced to monetary terms, the court must compare the value of the legal services and the benefit obtained on the basis of its best economic judgment. *See, e.g.*, *Merola*, 515 F.2d at 172; *Shlensky*, 574 F.2d at 150 n.12 (court must value intangible settlement benefit "on the basis of its best economic judgment"). *See also Bell Atlantic*, 2 F.3d at 1311; *Shell*, 2005 U.S. Dist. LEXIS 26246 at *9; *Smith v. DaimlerChrysler Services North America, LLC.*, 2005 U.S. Dist. LEXIS 25116 (D.N.J. Oct. 24, 2005).

[22]   Neither the *Shell* nor *Abbott Labs* Court considered lodestar in its fee analysis or award.

regulatory/compliance activities in an amount not less than $27 million and the adoption of a charter

for a Public Policy Committee of the Board.

**C.      Consideration of Relevant Third Circuit Factors Fully
Supports Payment of the Agreed Upon Fee Award Here**

Once satisfied of the substantial nature of the benefits the settlement provides, courts in the

Third Circuit weigh the relevant factors from among a series of considerations the Third Circuit

Court of Appeals has identified in determining a reasonable fee:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence
> or absence of substantial objections by members of the class to the settlement terms
> and/or fees requested by counsel; (3) the skill and efficiency of the attorneys
> involved; (4) the complexity and duration of the litigation; (5) the risk of
> nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and
> (7) the awards in similar cases.

*AT&T Corp. Secs. Litig.*, 455 F.3d 160, 165-6 (3d Cir. 2006) (quoting *Gunter*, 223 F.3d at 195 n.1).

The Third Circuit has cautioned that these factors, applicable to all types of class and derivative

actions,[23] should not be applied in a formulaic manner, recognizing that "in certain cases, one factor

may outweigh the rest," and making clear that district courts should also consider "any other factors

that are useful and relevant with respect to the particular facts of the case." *Id.*, 455 F.3d at 166.  An

assessment of relevant factors, as detailed below, fully supports award of the agreed upon attorneys'

fees and reimbursement of expense in the present action.

**1.      Consideration of the Skill and Efficiency of Counsel
and Any Innovative Terms of the Settlement**

As reflected in multiple submissions before the Court – including the declarations of the

mediator and plaintiffs' experts, the Course of Negotiation Memorandum, the Stipulation and

---

[23]  *See Cendant Derivative*, 232 F. Supp. 2d at 337 (applying *Gunter* factors to approve fee in derivative
settlement).

Exhibit A to the Stipulation – Plaintiffs' Counsel brought a high degree of skill, expertise and sophistication to bear in the litigation of the Derivative Actions. The Course of Negotiation memorandum details the chronology of the design, negotiation and implementation of each of the Board and management level governance and compliance provisions set forth in the proposed Settlement. Through their investigation, Plaintiffs' Counsel assessed root causes of the compliance problems that led to this litigation. Drawing upon extensive experience and rigorous additional research, Plaintiffs' Counsel identified, designed and negotiated innovative governance, compliance, and enterprise risk management reforms specifically tailored to address these problems at Schering. The Corporate Governance Plan they provided Schering in October 2003 was looked to as a template for the type of effective Board and management level oversight designed to avoid future problems with regulators and others. Plaintiffs' Counsel professionally engaged defense counsel and key Company compliance personnel over a multi-year period, fostering an extraordinary spirit of trust and synergistic interaction, and sparking intensive dialogue among the parties. It is based on this entire history of the negotiation process that Schering recognized in the Course of Negotiations memorandum that:

> plaintiffs' detailed recommendations on each of the corporate governance and compliance subjects detailed in Exhibit A to the Stipulation, reflective of the sophistication and expertise of plaintiffs' counsel, along with the Derivative Actions and the negotiations concerning their resolution, were a substantial factor in the design and implementation of the changes adopted by SGP.

*Id.*, at page 1. *See also* Exhibit A of the Stipulation, page 1. It is these governance and compliance reforms that plaintiffs' experts have described as constituting a best-in-class system. *See e.g.*, Langevoort, ¶ 4; Lam, ¶ 49. *See also*, Infante Decl. ¶ 27.

### 2. The Complexity and Duration of Litigation and the Amount of Time Devoted

This litigation was commenced almost seven years ago. It includes both a demand futility action filed before this Court, and a separate demand made on the Company's Board. It has involved intensive effort by Plaintiffs' Counsel in both actions, working cooperatively together to an extraordinary degree. Attached as Exhibits D through G to the Fee Declaration are separate, categorized lodestar charts for each of the four firms involved in the litigation of the Derivative Actions. Attached as Exhibit A is a combined lodestar category breakdown chart. This chart reflects total attorney and paralegal hours of 13,126.50 expended by the four firms over the course of the litigation. The separately filed Fee Declaration provides a detailed discussion of major tasks undertaken and performed by Plaintiffs' Counsel in each of the designated categories, in order to provide the Court with a basis to assess the work performed and the effort expended in litigating the Derivative Actions.[24] As discussed above and described in the Fee Declaration, Plaintiffs' Counsel have diligently worked to proceed in this action in an efficient manner, coordinating activities to avoid duplication. Accordingly, Plaintiffs' Counsel respectfully submit that the hours expended in the litigation of the Derivative Actions represents "hours reasonably worked." *In Re Rite Aid Corp. Securities Litigation*, 396 F.3d 294, 305 (3d Cir. 2005).

### 3. Plaintiffs Faced Substantial Risks in Prosecuting the Derivative Claims

As discussed in detail in Section V.C.2 above, derivative actions generally face substantial procedural and legal hurdles beyond those typically found in securities class action litigation. *See,*

---

[24] This level of detailed information was made available to the mediator and carrier counsel during the fee mediation process.

41

*e.g.*, *Maher*, 714 F.2d at 455 ("such litigation 'is notoriously difficult and unpredictable'" (*citing Schinvrel v. Goldman*, 57 F.R.D. 481, 487 (S.D.N.Y. 1973)). This is particularly so where – as here – the derivative action is premised on a claim that a corporate board failed to properly monitor the operations and employees of a company. *See, e.g.*, *Caremark International Inc. Derivative Litigation*, 698 A. 2d 959, 967 (Del. Ch. 1996) (Delaware Chancery Court found failure to monitor claim "is possibly the most difficult theory in corporate law upon which a plaintiff might hope to win a judgment.").

As a result particularly of, *inter alia*, the interplay of the business judgment rule and the demand requirement, a large portion of filed derivative actions are dismissed. Thus, very substantial risks confronted Plaintiffs' Counsel when they decided to invest their time and resources in this litigation. *See, e.g.*, *Cendant Derivative*, 232 F. Supp. 2d at 335 (finding such risks constituted "potentially powerful defenses available to the Settling Defendants").

### 4.    The Contingent Nature of the Fee

Plaintiffs' counsel undertook the prosecution of this highly complex matter on a wholly contingent basis. Without any assurance of remuneration, Plaintiffs' Counsel collectively invested more than 13,000 hours of professional time over an almost seven year period, and incurred $298,351.61 in litigation expenses. Plaintiffs' Counsel have received no compensation whatsoever to date for any of the work they have performed or in recognition of the wide-ranging and substantial benefits Schering has received as the result of their efforts.

The contingent nature of this litigation assumes even greater significance in the face of the material risks to success Plaintiffs' Counsel have faced in initiating and prosecuting these derivative claims – risks which must be assessed as of the time suit was originally brought. *See e.g.*, *In Re Fine*

42

*Paper Antitrust Litig*, 751 F.2d 562, 583 (3d Cir. 1984).  The Court in *Fine Paper* also recognized a second contingency-related factor: "the time value of compensation long delayed, when compared with normal billing and collection practice of law firms for fees and expenses."  *Id.*  Plaintiffs' Counsel respectfully submit that both of these aspects of contingency litigation apply to Plaintiffs' Counsel's award of fees in the present case. *See Worldcom, Inc., Sec. Litig.*, 2004 U.S. Dist. LEXIS 22992, *73 (S.D.N.Y. Nov. 12, 2004)("[plaintiffs' counsel] undertook this service on a fully contingent basis. Its risks and effort deserve to be awarded appropriately.").

### 5.    The Standing and Ability of Plaintiffs' Counsel

Pursuing these complex claims in a way that would result in a substantial benefit to Schering required the participation of highly skilled and experienced attorneys with expertise in the specialized field of substantive corporate governance and compliance reforms.  Schering and the individual defendants were and are represented by litigators from some of the most respected law firms in the United States, reflecting the challenge faced by Plaintiffs' Counsel. *See e.g.*, *In Re Brown Co. Securities Litigation*, 355 F. Supp. 574, 592 (S.D.N.Y. 1973).  As their respective firm resumes reflect, Plaintiffs' Counsel here have a long history of successfully prosecuting complex corporate derivative and securities cases.  *See* Exhibits D through G to the Fee Declaration.  As demonstrated herein, Plaintiffs' Counsel brought a high degree of expertise and sophistication to bear in the litigation of the Derivative Actions.  This experience and ability of Plaintiffs' Counsel was instrumental in achieving the wide-ranging governance and compliance reforms set forth in the proposed Settlement.

6.     **The Fact the Parties, in Arm's Length and Contentious
       Negotiations Pursuant to Formal Mediation, Arrived at
       The Agreed upon Fee and Expense Amounts**

Plaintiffs' Counsel respectfully submit that an additional factor that merits consideration by

the Court as one "useful and relevant with respect to the particular facts of the case," (*AT&T*, 455

F.3d at 166) is the fact that the agreed upon award of $9.5 million in attorneys' fees and

reimbursement of expenses up to $300,000 was the direct result of hard fought, arm's length

negotiations among Plaintiffs' Counsel, Company counsel and counsel for the directors' and

officers' insurance carriers, under the auspices of retired Magistrate Judge Infante. *See e.g.*,

*Shlensky*, 574 F.2d at 150 ("the presence and active involvement of the corporation against which

an award of the plaintiffs' attorneys' fees and other litigation costs may be assessed distinguishes a

shareholders' derivative suit from a class action for purpose of the fee awards").

No discussion of any fee award occurred until after the parties had arrived at an agreement

in principal of all of the substantive terms of the proposed Settlement.  Both Schering and its

directors' and officers' insurance carriers were represented by highly skilled, experienced and

sophisticated counsel.  As recognized by the mediator: "As the entities that would fund the fee, the

carriers took a highly active role in negotiating the amount of the fees to which they and the

Company would agree." *See* Infante Decl. ¶ 31.  Through this intensive negotiation process, the

defendants were uniquely situated to assess the value of Plaintiffs' Counsels' work and the role it

played in achieving the reforms at the heart of the proposed relief.

Courts in this Circuit and elsewhere have recognized that "courts must do their best to award

counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of

compensation in the market at the time." *Texas v. Organon USA Inc. (In Re Remeron End-Payor*

*Antitrust Litigation)*, 2005 WL 2230314 at \*45 (D.N.J. Sept. 13, 2005) (citations omitted), *quoting In re Synthroid Marketing Litig.*, 264 F.3d 712, 718 (7th Cir. 2001).  "The object ... is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation."  *In re Remeron Direct Purchaser Antitrust Litig.*, 2005 U.S. Dist. LEXIS 27013, \*89 (D.N.J. Nov. 9, 2005). Plaintiffs' Counsel thus respectfully submit the fact that the requested fee and expense amounts were the product of an arm's length and contentious negotiation process – which included counsel from the insurance carriers (who will fund any award approved by the Court) as well as the Company – conducted pursuant to formal mediation provides substantial additional support for the reasonableness of the fee award sought here.

### D.  Assessing Attorneys' Fees under the Lodestar Methodology

Under the facts of this case, Plaintiffs' Counsel believe that the lodestar methodology provides substantial support as well for the award of the fees requested.  The structure of the lodestar method in the Third Circuit is similar to other jurisdictions.  The lodestar method "multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services."  *AT&T*, 455 F.3d at 164.  When attorney's fees are awarded, the hourly rate at the time of the petition is then applied to the hours expended.  *See e.g.*, *Access 4 All, Inc. v. AAMJ, LLC*, 2007 WL 655491, \*5 (D.N.J. 2007, Feb. 27, 2007) *citing Lanni v. State of New Jersey*, 259 F.3d 146, 149-50 (3d. Cir. 2001).  *See also*, *Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining and Manufacturing Company)*, 2007 WL 1468847 \*18 (E.D.Pa.,2007, May 14, 2007) ("The lodestar amount covers work done from the inception of the claims in this action through January 18, 2007 and is calculated at current rates.").  The Court may then apply a multiplier to the lodestar to "reflect the risks of nonrecovery, to reward an extraordinary result or to encourage counsel to undertake

45

socially useful litigation." *See Cendant Derivative*, 232 F. Supp. 2d at 342. *See also, AT&T*, 455 F.3d at 164, n.4 (Third Circuit found "[t]he multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." (citations omitted)).

The Third Circuit has reiterated its prior finding in *In Re Prudential Insurance Company America Sales Practices Litigation Agent Actions*, 148 F.3d 283, 341 (3d Cir. 1998), that "multipliers ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *In re Cendant Corporation PRIDES Litigation*, 243 F.3d 722, 742 (3d Cir. 2001). *See also*, *Cendant Derivative*, 232 F. Supp. 2d at 341-42 (court approved fee request of $12 million, which constituted a multiplier of 2.59); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 862 (E.D. Mo. 2005) (court approved request for 2.9 multiplier in a derivative settlement involving corporate governance relief, noting that in shareholder derivative actions, "courts typically apply a multiplier of 3 to 5 to compensate counsel for the risk of contingent representation").

The hourly rates requested by Plaintiffs' Counsel in this matter are reasonable and consistent with the standards for complex litigation in federal court. These rates represent what Plaintiffs' Counsel currently charge their non-contingent clients and/or have been approved in other similar contingent litigation. *See* declarations of counsel at Exhibits D through G attached hereto. These rates fall below the rates charged by the defense firms Plaintiffs' Counsel routinely face in complex litigations, who are typically engaged on a non-contingent hourly rate basis. Each of these factors support a conclusion that the rates requested fall well within the range of reasonableness, and should be approved.

46

As reflected at Exhibit A to the Fee Declaration, Plaintiffs' Counsel have expended a total of 13,126.50 hours in litigating the Derivative Actions since their inception in early 2001 to the present, reflecting a total lodestar of $6,953,322.50. Award of the agreed upon amount of $9.5 million in attorneys' fees would constitute a multiplier of less than 1.37. As indicated by the above, payment of such a multiplier – particularly under the facts and circumstances present here – would fall well within the range of multipliers awarded in this Circuit, and reflects the hard-fought fee negotiations in which the parties engaged.

### E.   The Request for Payment of Litigation Costs and Reimbursement of Expenses is Reasonable

Plaintiffs' Counsel have incurred a total of $298,351.61 in unreimbursed costs and expenses since the inception of this case.   These costs were incurred to pay litigation expenses for, among other things, expert witnesses, mediation, and photocopying costs in connection with the document production effort. *See* Exhibits B and C to the Fee Declaration and Plaintiffs' Counsel individual declarations (found at Exhibits D through G of the Fee Declaration). These costs and expenses were reasonable and necessary to the prosecution of the case. *See., e.g.*, *Oh v. AT&T Corp.*, 225 F.R.D. 142, 154 (D.N.J. 2004) (finding litigation expenses such as those sought by Plaintiffs' Counsel here to be reasonable); *In re Chambers Dev. Sec. Litig.,* 912 F. Supp 852, 863 (W.D. Pa. 1995) ("Plaintiffs' counsel also are entitled to be reimbursed for all reasonable expenses necessary for the successful prosecution of this litigation.").

### F.   Assessing Objections to Award of the Fee Request

Of the letter objections set forth at Exhibit 1 hereto, twelve raise issue with the award of attorneys' fees. These objections often pair concerns with award of a fee with conclusions that the

settlement terms do not provide substantial benefit to the Company.  Plaintiffs' Counsel have

addressed these latter concerns in detail above.  *See* Section VII. B. above.  In other cases, the letter

objections provide no particular basis for objecting to the fees requested.  In a number of these cases,

the objections to the award of a fee are conclusory in nature.  Courts in this district and elsewhere

have repeatedly held that conclusory objections provide little merit.[25]  Plaintiffs' Counsel have

provided a detailed record for the basis of an award of the fee and reimbursement of expenses

requested, going both to the legal and factual support for the award of the fee requested, and to the

procedural integrity of the fee negotiation and mediation process.  Plaintiffs have provided extensive

documentation of the hours expended over the course of a seven year period and of the scope and

nature of the work entailed.  The requested fee was negotiated at arm's length, with an adversary

who was uniquely positioned to assess Plaintiffs' Counsel's role in the reforms reflected in the

proposed Settlement, and who, indeed, expressly recognized Plaintiffs' Counsel's sophistication and

expertise.  The fee requested is reasonable based on an analysis of each of the relevant factors

described above.

---

[25]  *See, e.g., AOL Time Warner, Inc.,* 2006 WL 903236 *15 (S.D.N.Y. Apr. 6, 2006)(none of the objections
provide "a legal or factual basis for the alleged insufficiency of the Settlement, nor do they consider the legal
or factual context in which the Settlement was reached"); *In Re Remeron End-Payor Antitrust Litigation,*
2005 WL 2230314 at *18 (Court determined without merit objection points it found to be "entirely
unsupported, too vague to comprehend, or clearly without merit"); *In Re Aremissoft Corporation Securities
Litigation,* 210 F.R.D. 109, 132 (D.N.J. 2002) ("The fact that only one Class Member made a vague and
conclusory objection, well after the deadline to do so, strongly evidences that the Fee Application is fair and
reasonable."); *In re Ikon Office Solutions Inc, Securities Litigation,* 209 F.R.D. 94, 104-5 (D.N.J. 2002).; *In
re Prudential Sec. Inc. Limited Partnership Litig.,* 1995 WL 798907 * 13 (S.D.N.Y. Nov. 20, 1995) ("Such
letter simply makes the unsupported assertion that the Settlement is inadequate and the fees are excessive");
*In re Rio Hair Naturalizer,* 1996 WL 780512, at *15 (E.D. Mich. Dec. 20, 1996 ) ("General objections
without factual or legal substantiation carry little weight") (*quoting* 2 Newberg (3d) § 11.58).

## VIII.  CONCLUSION

The detailed provisions of the proposed Settlement help place Schering at the forefront of

corporate governance and compliance reforms in the country.  The Settlement is a superior result and

provides substantial benefit to Schering and its shareholders.  Plaintiffs and Plaintiffs' Counsel

respectfully request that the Court find the proposed Settlement to be fair, reasonable and adequate

to Schering and its shareholders and approve the Settlement in its entirety.  Plaintiffs and Plaintiffs'

Counsel further respectfully request that the Court approve the requested award of attorneys' fees

in the amount of $9.5 million and the reimbursement of expenses in the amount of $298,351.61.

Dated:   December 4, 2007

MORRIS and MORRIS LLC
COUNSELORS AT LAW

By: _____

Karen L. Morris
Patrick F. Morris
4001 Kennett Pike, Suite 300
Wilmington, DE 19807
(302) 426-0400


LAW OFFICES  BERNARD M. GROSS, P.C.
Bernard M. Gross
Deborah R. Gross
Suite 450, The John Wanamaker Building
Juniper and Market Streets
100 Penn Square East
Philadelphia, PA  19107
(215) 561-3600


SQUITIERI & FEARON, LLP
Olimpio Lee Squitieri
2600 Kennedy Boulevard
Jersey City, NJ   07306
(201) 200-0900


Attorneys for Demand Futility Plaintiffs


49

ABRAHAM, FRUCHTER &
   TWERSKY, LLP
Jeffrey S. Abraham
One Penn Plaza, Suite 2805
New York, NY 10119
(212) 279 5050

Attorney for Demand Plaintiff