## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**NOT FOR PUBLICATION**

| | |
|---|---|
| IN RE SCHERING-PLOUGH CORPORATION SHAREHOLDERS DERIVATIVE LITIGATION | Master Derivative Docket Civ. Action No. 01-1412 |

**Katharine S. Hayden, U.S.D.J.**

### I. INTRODUCTION

On December 11, 2007, the Court granted final approval to the settlement of these consolidated derivative actions.  The terms contained in the stipulation of settlement require Schering-Plough ("Schering") to implement widespread changes to its corporate governance and compliance practices for a period of five years.  Plaintiffs' counsel seeks $9.5 million in attorneys' fees and $300,000 in costs and expenses, an amount not contested by Schering.  The Court must determine whether to grant the proposed fee award.

### II. SUBSTANTIAL BENEFIT DOCTRINE

The Supreme Court made clear in <u>Mills v. Elec. Auto-Lite Co.</u>, 396 U.S. 375, 395 (1970), that although attorneys' fees have historically been awarded from financial recoveries, an award of counsel fees is justified where a corporation receives a 'substantial benefit' from a derivative suit, regardless of whether the benefit is pecuniary in nature.  <u>See also</u> <u>Zucker v. Westinghouse Elec. Corp.</u>, 265 F.3d 171 (3d Cir. 2001).  The Supreme Court explained that this judge-created exception to the American rule that attorneys' fees are

not ordinarily recoverable as costs is grounded in the unjust enrichment doctrine, in that allowing "others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense." Mills, 396 U.S. at 392.  To qualify as substantial, the benefit must be "something more than technical in its consequence and one that accomplishes a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or affect the enjoyment or protection of an essential right to the stockholder's interest." Id. at 396.

### A. The Benefit Sought

The Mills standard requires the Court to carefully examine the benefit to Schering that resulted from the derivative litigation to determine whether "it corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation." Id.  The Court first looks to the operative complaint to identify the benefit sought by the litigation and the nature of the derivative claims.  The second amended complaint states that this is a shareholder derivative action brought on behalf of Schering to recover for damages caused by the defendants' breaches of fiduciary duty owed to Schering and its shareholders.  (Joint Consol. Second Am. Compl. ¶ 1.)  Specifically, the complaint alleges:

> Defendants intentionally or recklessly ignored repeated, clear, and unmistakable warnings that essential Company production facilities – responsible for the manufacture of virtually every significant prescription and over-the-counter drug Schering sells – were plagued by severe and pervasive manufacturing and quality control system breakdowns and failures which threatened not only the Company's good standing with federal regulatory authorities, but also its ability to successfully manufacture and market its most important products.

(Joint Consol. Second Am. Compl. ¶ 2.)  This action was brought after the corporation publicly announced in February 2001 that the FDA, citing manufacturing deficiencies

2

impacting the quality of Schering's pharmaceutical products, decided to delay approval for the marketing and sale of the allergy drug 'Clarinex.' Before the decision to delay approval, Schering had received several warning letters from the FDA regarding manufacturing deficiencies in its plants in Puerto Rico and New Jersey. The complaint further alleges that the Board's lack of oversight, exemplified by the failure to sufficiently address the FDA's warning letters, led to the manufacturing deficiencies and increased FDA scrutiny, the public disclosure of which devalued Schering stock and damaged the corporation's reputation.

"Devised as a suit in equity, the purpose of the derivative action was to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." Kamen v. Kemper Fin. Servs., 500 U.S. 90, 95 (U.S. 1991) (internal citations omitted). The primary interest of the corporation this suit sought to protect was the efficacy of Schering's corporate governance structure, particularly with regards to oversight functions, as evidenced by the operative complaint:

> Plaintiffs also seek: (1) the creation of a committee of board members to constitute a separate compliance committee consisting solely of independent board members with the authority to engage independent outside consultants and other professionals to carry out the mandate of the committee to devise and implement quality control and compliance initiatives; (2) the creation of operating units at the corporate level reporting directly to Schering's board to investigate and address "good manufacturing practices" and devise and implement uniform procedures to be used throughout the company for compliance with all applicable FDA requirements; (3) the creation of a corporate department reporting directly to Schering's board to be the company's liaison with the FDA on all manufacturing issues; (4) the imposition of corporate practices and procedures which require any internal quality control or compliance task forces to report directly to a committee of independent directors of Schering's board.

(Joint Consol. Second Am. Compl. ¶ 135.)  The suit also sought monetary recovery of the offending Directors' salaries, disgorgement of proceeds from alleged insider trading and indemnification for losses sustained as a result of the corporate governance deficiencies, including losses from other lawsuits and regulatory actions.  Although the settlement did not recover the money losses, the fundamental aim of the litigation was to correct the Board's failure of oversight, and the resulting damage to Schering, by implementing specific changes to the Schering's corporate governance mechanisms.  The monetary losses and the regulatory troubles with the FDA are the fruit of the same tree, stemming directly from a breakdown in Schering's managerial structure.  Thus, the most important motivation for maintaining this action was to prevent future losses of this ilk by changing how the corporation's directors oversee the running of the corporation.  In making a determination of whether the litigation accomplished this, the Court necessarily relies on the declarations provided to the Court by plaintiffs.

### B. Substantiality of the Benefit

In support of its petition for an award of attorneys' fees, plaintiffs submitted to the Court the declaration of Professor Donald C. Langevoort.  Professor Langevoort is the Thomas Aquinas Reynolds Professor of Law at the Georgetown University Law Center, where he has taught since 1999, and focuses his scholarship on corporate governance and corporate behavior.  (Langevoort Decl. ¶ 2-3.)  He explains that he was asked to address "whether the package of reforms described in the Settlement places Schering's corporate governance, compliance and risk management systems at the forefront of practices designed to protect and further the best interests of the company and its shareholders." (Langevoort Decl. ¶ 4.)   He identifies three key areas affected by the settlement: (1) Board-

level changes regarding compliance and risk management matters; (2) extensive management-level changes designed to complement the Board's oversight functions by providing better information; and (3) changes to the selection, election, and compensation of the Board.  (Langevoort Decl. ¶ 5.)

In discussing the benchmarks he used to evaluate the terms of the settlement, which include the corporate governance frameworks developed by the Committee of Sponsoring Organizations of the Treadway Commission and the provisions of the U.S. Sentencing Commission's Organizational Sentencing Guidelines (OSG), Professor Langevoort indentifies "two main benefits that can come to a company from better oversight and other improvements in its audit, compliance and risk management program."  (Langevoort Decl. ¶ 6.)  First, "an effective internal controls and compliance program can prevent or deter misconduct that would otherwise subject the company and its shareholders to a risk of severe financial and reputational harm, or uncover and remedy misconduct at the early stages before it becomes more harmful."  (Langevoort Decl. ¶ 6.)  Second, "[i]f a violation of law occurs for which Schering might be held responsible under broad principles of *respondeat superior*, various federal agencies (including the SEC and the Department of Justice) have indicated in formal pronouncements that they will evaluate the quality of the company's compliance and ethics efforts in deciding whether to charge the company itself with liability."  (Langevoort Decl. ¶ 7.)  The OSG provide for a downward departure where the corporation had an effective program in place to prevent and detect violations of law.

As to the first structural change, Professor Langevoort explains that the settlement seeks to foster the active involvement of the Board in oversight by: (1) requiring the Board's Business Practices Oversight Committee (BPOC) to conduct periodic reviews of the

non-financial and operational aspects of the audit plan prior to implementation; (2) providing the Senior Vice President of Global Compliance and Business Practices direct access to the Board; and (3) requiring the Board to receive detailed reporting of compliance and risk related information.  (Langevoort Decl. ¶ 10.)

As to the second structural change, he concludes that the Board's oversight function is strengthened by: (1) centralizing Schering's global compliance and audit functions in the office of the Senior Vice President of Global Compliance and Business Practices; (2) making the Senior Vice President of Global Compliance and Business Practices responsible for assuring that the BPOC is briefed annually on the findings of the global audit and reviews the audit plan prior to implementation; and (3) requiring the Senior Vice President of Global Compliance and Business Practices to report regularly to the BPOC on employee compliance with Schering's Standards of Global Business Compliance.

As to the third structural change, Professor Langevoort points to: (1) the elimination of a staggered Board by requiring each director to stand for election annually; (2) enhancements in Director training on regulatory trends, with specific focus on the FDA; (3) each Board member being given the right to seek help from outside lawyers and accountants; and (4) the elimination of meeting and committees fees, which compensated members for being on multiple committees, and the implementation of transparent Director compensation, whereby Directors receive an annual retainer. (Langevoort Decl. ¶ 34-35.)

The changes highlighted by Professor Langevoort's declaration support a determination that the derivative litigation brought about significant changes to Schering's corporate governance structure.  The changes implemented by the settlement will serve to

prevent or deter misconduct at the Board and middle-management levels, while also providing mechanisms to indentify emerging misconduct. The most important changes are perhaps at the Board-level, where both the elimination of a staggered board in favor of annual elections, which reduces the risk of director entrenchment, and the implementation of transparent Director compensation without committee fees promote Board independence. The Court also notes the significance of management-level changes designed to complement the Board's oversight functions, particularly centralizing Schering's global compliance and audit functions in the office of the Senior Vice President of Global Compliance and Business Practices, which facilitates the direct reporting of compliance information to the Board. These corporate governance changes are substantial non-pecuniary benefits to Schering and justify an award of counsel fees under the substantial benefit doctrine. Having decided that a fee award is appropriate, the Court must also determine a reasonable amount of attorneys' fees to award.

## III. REASONABILITY OF THE FEE AWARD

The approved settlement does not involve monetary benefits, because the terms only require Schering to implement changes to its corporate governance practices. Thus, the Court must employ the lodestar method to determine the reasonability of the proposed fee award. The lodestar methodology for assessing an award of attorney's fees is well-suited to a shareholders' derivative suit in which the benefit the corporation received from settlement was non-monetary. The Third Circuit has explained that the lodestar method is more typically applied in cases "where the nature of the recovery does not allow the determination of the settlement's value required for application of the percentage-of-recovery method." In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005). Under

this method, the first step is to arrive at the lodestar amount, which is calculated by multiplying the number of hours counsel worked on a case by a reasonable hourly billing rate for such services.  In re AT&T Corp. Secs. Litig., 455 F.3d 160, 164 (3d Cir. 2006) (internal citations omitted).  The proposed fee is then divided by the lodestar amount to arrive at the lodestar multiplier.  Id.  The second step is to adjust the multiplier to reflect the particular circumstances of the case, such as the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risks involved.  Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000).

Plaintiffs' counsel have proposed, after vigorous negotiations with Schering's counsel and the corporation's insurance carriers during mediation sessions with Retired Magistrate Judge Edward A. Infante, an award of $9.5 million in attorneys' fees and reimbursement of expenses up to $300,000, which Schering does not oppose.  (Infante Decl. ¶ 32.)  Exhibit A to the Fee Declaration puts the number of hours expended by plaintiffs' counsel at 13,126.50 since the commencement of these derivative actions in 2001, a figure which generates a lodestar amount of $6,953,322.50 and a lodestar multiplier of 1.37, given the proposed attorneys' fee award of approximately $9.5 million. For the Court to grant a fee award subject to a lodestar multiplier, it must provide specific justification for doing so, such as the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risks involved.  Gunter, 223 F.3d at 195 n.1.

The Court's discussion addressing the substantiality of the benefits derived from the litigation by Schering also has bearing on its determination of a reasonable fee, particularly with respect to the complexity of the issues presented.  A good deal of effort was required

of plaintiffs' counsel to investigate and evaluate Schering's corporate governance mechanisms, and then embark on a redesign of a governance structure that spans the globe.   Exhibit A to the Fee Declaration indicates that 2,930.50 hours were spent conducting 'Governance and Compliance Factual Investigation,' 'Governance and Compliance Legal Research,' and 'Governance and Compliance Design and Drafting of Proposals and White Paper.'  Plaintiffs' expert James Lam ("Lam"), President of a consulting firm specializing in risk management, calls attention to the 350% increase in governance and compliance spending prompted by the derivative litigation, which demonstrates the complexity and breadth of the changes to Schering's corporate governance structure attributable to the efforts of plaintiffs' counsel.  (Lam Decl. ¶ 12.)  The litigation has led to the corporation hiring more compliance staff, centralizing the oversight functions, creating new compliance positions, and restructuring the oversight role of its Board.  Importantly, Lam concludes that Schering now has best-in-class governance and compliance practices. (Lam Decl. ¶ 16.)   The magnitude of the subject of this litigation, the wholesale restructuring of a major corporation's governance and compliance functions, underscores the complexity of this litigation and speaks to the reasonability of awarding a fee subject to a lodestar multiplier.

In determining whether to apply a multiplier, it is also appropriate to consider the risk plaintiffs' counsel hazards in litigation of this nature.  One of the recognized purposes of the lodestar method is to assure that counsel undertaking socially beneficial litigation receive an adequate fee irrespective of the monetary value of the final relief achieved for the class.  In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 821 (3d Cir. 1995).  This litigation provides an example of how derivative actions that result in the

adoption of rigorous compliance standards confer tangible benefits to the corporation and its shareholders. Schering paid over $1 billion to resolve several government investigations. The adoption of the corporate governance and compliance mechanisms required by the settlement can prevent breakdowns in oversight that would otherwise subject the company to the risk of regulatory action, or uncover and remedy a problem at the early stages before it becomes the subject of a government investigation. Effective corporate governance can also affect stock price by bolstering investor confidence and improving consumer perceptions. As evidence of this, Lam cites the increasingly positive trend in Schering's financial performance since the corporation agreed to implement some of the governance changes in 2003, as well as studies indicating that "good governance practices are a statistically significant contributing factor to performance results." (Lam Decl. ¶¶ 41-45.) Because there is no applicable fee-shifting statute, derivative litigation counsel in this matter took on significant risk by pursuing this socially beneficial litigation. Counsel performed over 13,000 hours of diligent work with no assurances of payment or reimbursement for fees and expenses. The results of counsels' efforts achieve the socially laudable goal of promoting regulatory compliance, which is particularly important in light of Schering's role as one of the world's leading pharmaceutical companies.

The Court also notes that the proposed fee award is the product of mediation under the guidance of Retired Magistrate Judge Edward M. Infante. The fee discussions included plaintiffs' counsel, Schering, the corporation's insurance carriers, and counsel for two of the Schering Directors. (Infante Decl. ¶ 29.) During the course of the mediation, counsel for the insurance carriers, the parties bearing responsibility for paying the fee award, were allowed to review plaintiffs' counsels' daily time records. (Infante Decl. ¶ 31.) The parties

ultimately agreed on a proposed fee award of $9.5 million, approval of which is currently before the Court.  In describing the mediation on the issue of fees, Judge Infante (Ret.) indicated that he was "fully satisfied with the resolution the parties reached with respect to plaintiffs' counsels' compensation."  (Infante Decl. ¶ 32.)

Having examined the complexity of the issues confronted by plaintiffs' counsel and the socially beneficial results achieved by the settlement, the Court determines that the proposed fee award of $9.5 million, which represents a 1.37 multiplier under the lodestar method, is reasonable and appropriately accounts for the particular circumstances of this litigation.  The Court also determines that the proposed reimbursement of up to $300,000 in expenses, which consists mainly of experts' fees, is reasonable under the facts and circumstances of this matter.

## IV. Conclusion

Based on the forgoing, the Court awards plaintiffs' counsel fees in the amount of $9.5 million for attorneys' fees and up to $300,000 for costs and expenses.


Dated:  1/14/08                           /s/Katharine S. Hayden

                                          Katharine S. Hayden, U.S.D.J.